Burns Scott **HOWARD,**
**Plaintiff-Appellant,**

v.

The **CHESAPEAKE AND OHIO RAILWAY COMPANY,**
**Defendant-Appellee.**

No. 85–6106.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 16, 1986.

Decided Feb. 17, 1987.

Frank H. Warnock, Warnock and Warnock, Greenup, Ky., Ralph E. Koenig (argued), Minneapolis, Minn., Michael L. Weiner, for plaintiff-appellant.

Paul Hobbs (argued), Ashland, Ky., for defendant-appellee.

Before NELSON and RYAN, Circuit Judges, and ENSLEN, District Judge.

DAVID A. NELSON, Circuit Judge.

Dissatisfied with a $100,000 jury verdict he recovered in a Federal Employers' Liability Act action against the defendant railroad, plaintiff Burns Scott Howard has appealed the judgment entered on that verdict. Although the trial court declined to give a jury instruction requested by the defendant railroad to the effect that future earnings ought to be discounted to their present value, should the jury decide to award damages for loss of future earning capacity, plaintiff contends that the trial court nonetheless erred in instructing the jury to disregard the effect of inflation in considering any such award. Finding, on the particular record before us, no prejudicial error, we shall affirm the judgment.

I

Plaintiff Howard, who was 26 years old at the time of trial in mid–1985, was graduated from high school in 1977. He went to work for the railroad in the summer of 1978, and worked there full-time (except for periodic furloughs occasioned by economic conditions) until August 4, 1981, when he was allegedly injured in an accident. He did not work thereafter.

Plaintiff's evidence showed that on the night in question he was working as a "skateman" in a rail yard, where his job was to climb aboard moving coal cars and bring them to a stop by setting their handbrakes; that the cars were being sent down the classification tracks at an excessive rate of speed, the yard was not adequately illuminated, and the work area had debris in it; and that plaintiff lost his footing as he tried to climb aboard one of the cars, tripped over a piece of debris, and fell to the ground, injuring his left shoulder, arm and rib cage. Plaintiff was taken to the office of a trainmaster, who, after making a visual inspection for injuries, drove him to a nearby hospital. The hospital charts and accident reports filled out at the time indicated no loss of consciousness and no head injury; plaintiff seemed mentally alert, and the pupils of his eyes were not dilated. He subsequently contended, however, that the accident—which was not witnessed by anyone else—must have knocked him unconscious.

Plaintiff went home after having been seen in the hospital emergency room, but he was hospitalized two days later for back and shoulder pain. An orthopedic surgeon operated on his shoulder in May of 1982. By the summer of that year plaintiff was showing signs of mental depression. In January of 1983 a psychiatrist saw him and made a diagnosis of post-traumatic syndrome, with major depression and anxiety. In 1985 a neuropsychologist made a diagnosis of brain dysfunction; that diagnosis was subsequently confirmed by other experts, including a psychiatrist who examined plaintiff for the defendant railroad.

The evidence was in dispute as to whether the brain dysfunction diagnosed in 1985 could be said, with reasonable medical certainty, to have been caused by the accident plaintiff claimed to have suffered in 1981. Plaintiff's expert witnesses opined that there was a direct causal relationship, and the defendant railroad's expert denied that any such causal relationship had been established. The defendant's expert testified that although plaintiff's condition might possibly have been caused by a fall that knocked him out, the condition could also have been the result of intercerebral multiple sclerosis, Alzheimer's disease, a brain tumor, a blood clot, meningitis, infection, deoxygenation of the brain during general anesthesia, or various other causes that had not been ruled out. Plaintiff's lawyers

argued to the jury that the brain damage was "the real thing in this case ... the most devastating injury of all," and a major question before the jury was whether plaintiff had in fact shown that he suffered from brain damage caused by his alleged fall at work.

The defense presented testimony from a union official, one Frank Davis, to the effect that plaintiff had complained, several weeks before the alleged accident, of having hurt his left shoulder while doing farm work. Mr. Davis testified that there had been discussion of the possibility of plaintiff's receiving disability payments from the railroad on account of his shoulder condition, and that he (Davis) had made an anonymous telephone call to a railroad claim agent to suggest that plaintiff's claim was fraudulent. Mr. Davis' testimony was vigorously challenged on cross-examination, and other employees who were supposed to have heard the original conversation denied that it had taken place.

With respect to plaintiff's earnings prior to the accident, plaintiff did not disagree with records showing that his railroad wages (exclusive of the value of fringe benefits) had been $5,122 in 1978, $8,587 in 1979, $16,237 in 1980, and $9,969 in 1981. Through an economist, Dr. William Cobb, plaintiff presented evidence that the fringe benefits and wages lost thereafter up to the beginning of the month in which the trial was held, July of 1985, had come to slightly over $100,000. The railroad made no significant attempt to suggest that this $100,000 actual earnings loss figure was not accurate.

Dr. Cobb also testified on what plaintiff's future earning capacity would have been had he not been permanently disabled at the time of trial. Dr. Cobb explained that he had attempted to estimate the future "real" wage increases that the plaintiff would have received over the course of a normal working career with the railroad, expressing those increases in constant 1985 dollars without any element of inflation. Dr. Cobb said he also attempted to determine the present value of that stream of future earnings, discounting the earnings at an unspecified "real" interest rate that might have obtained in an environment free of inflation and of any expectation of inflation. With adjustments for anticipated taxes on both the wages plaintiff could have been expected to earn if he had remained at work and the income he could be expected to receive on a lump sum damage award, and with further adjustments for what Dr. Cobb believed to be reasonable (but unspecified) assumptions as to life expectancy, furlough rates, risk of illness or job loss because of economic conditions, and so forth, Dr. Cobb testified that in his opinion the present value of the loss of future wages and fringe benefits experienced by a permanently disabled 26 year old railroad worker with the plaintiff's earnings history and seniority would be slightly over $1.7 million.

Asked on cross-examination if there was a prediction of future price inflation in any portion of his calculations, Dr. Cobb testified that there was only one place in his economic model where it had been necessary to use an estimate for inflation: that was in projecting the taxes on the income from a hypothetical lump sum damage award. The inflation rate used in this connection, Dr. Cobb testified, was 7.24% per annum, carried out through the year 2028.

Dr. Cobb did not say what figure his economic model would have yielded had he assumed an inflation rate of zero, but he did testify that a rough approximation of the value of plaintiff's earning capacity could be arrived at by taking $35,000 a year (plaintiff's estimated wages plus fringe benefits for the first half of 1985 having come to about half that amount) and simply multiplying $35,000 by the remaining number of years plaintiff might have worked. Assuming, as Dr. Cobb invited the jury to do, that plaintiff would have worked 43 more years, this computation (43 × $35,000 = $1,505,000) would peg the future earning loss at roughly $200,000 below the figure produced by the more sophisticated economic model. The jury could thus have inferred that if Dr. Cobb had assumed no inflation when he made his sophisticated present value calculation, he would have come up with an estimated

earning loss of roughly $1.5 million as opposed to $1.7 million.

The reason inflation did not play a bigger part in Dr. Cobb's calculations, as he explained, was that in his view the market rate of interest appropriately used in making a present value calculation approximates the percentage rate at which wages can be expected to rise in the future. Inflation rates have historically been a major component of interest rates, Dr. Cobb said, and whatever assumptions are made about the course of future inflation, inflation should not be a significant factor in the calculation of economic loss: the inflation element in the present value calculation offsets the inflation element in the calculation of future earnings. "[D]espite all the rigamarole of trying to find what inflation is," he testified, "how much you discount it in terms of the interest that will be earned, almost all of that washes out." When asked, on cross-examination, if he claimed to be able to predict what the inflation rate will be 10, 15 or 20 years from now, Dr. Cobb answered "No. I'm saying, in fact, it doesn't make any difference...."

The defendant railroad did not call any economist to the stand, and in final argument to the jury the railroad's counsel spent most of his time attempting to minimize the extent of the plaintiff's physical and mental problems and arguing that they were not the result of the alleged accident. Defense counsel devoted only three transcript pages of argument to the question of economic damages. Pointing out that plaintiff's actual wages in his last full year of employment had been about $16,000, counsel argued that if the jury awarded $160,000, and if plaintiff invested that amount at 10% per annum and never invaded the principal, plaintiff could receive a lifetime income of $16,000 per year and still leave $160,000 to his wife and children at his death. Plaintiff's counsel did not object to this argument.

The jury was charged by the trial court that if plaintiff were found to have been injured as a consequence of the defendant railroad's negligence, the jury should assess as damages no more and no less than the amount found, by a preponderance of the evidence, to be full, just and reasonable compensation for all of the loss so caused. Among the elements of damage the jury was told it should consider, to the extent it found them proved by a preponderance of the evidence, were "any earnings or working time lost in the past and any loss of ability to earn money in the future...." In considering any element of future damage, the trial court continued, "you are instructed that you should not take into account any possible effect [of] present ... or future inflation one way or the other." The jury was also told that any award would not be subject to income taxes, "and you should not consider any such taxes in fixing the amount of your award...."

Significantly, the jury charge did not include an instruction, requested by the defendant railroad, on reducing future earnings to present value—this despite the fact that in a colloquy outside the presence of the jury, the trial judge and counsel for both of the parties had all agreed that there must be a reduction of future earnings to present value. Counsel for the railroad did not specifically renew his request for a present value instruction after the charge had been given, but plaintiff's counsel specifically objected to the instruction that the jury "should not take into account any possible effect of present or future inflation one way or another." The court declined to change its instructions.

The jury returned a verdict for the plaintiff and against the defendant railroad, assessing the plaintiff's actual damages in the amount of $100,000. There were no special interrogatories, and the jury was not asked to state whether it found the accident had caused any disability likely to extend beyond the time of trial. The plaintiff moved for a new trial on damages, contending that the jury should not have been instructed to disregard inflation in determining future damages. The motion for a new trial was denied without opinion, and this appeal followed.

## II

A claimed earnings loss of over $100,000 having already accrued by the time of trial,

it may seem inherently improbable that the jury's award of damages totaling $100,000 was intended to include anything at all for loss of future earning power. The jury was not obliged to find the defendant railroad responsible for any disability that may have existed at the time of trial, of course, and if the jury intended to award nothing for loss of future earnings, it is immaterial whether instructional error might have led the jury to think the maximum allowance for loss of future earning capacity was "roughly" $1.5 million rather than $1.7 million.

Regardless of whether there were technical errors in the court's charge on the evaluation of future earning capacity, moreover, the trial judge may well have been correct in suggesting, as he did in overruling a motion by the railroad to strike the economist's testimony in its entirety, that "if the Plaintiff wishes to spread their blanket clear across the courtroom" with an obviously overblown estimate of damages, "that will be to [the defendant's] advantage ultimately." The jury may or may not have been better equipped than Dr. Cobb was to guess the course of future inflation, and the jury probably had no idea of how to go about making present value calculations itself, but it would not be surprising if the judge was reading his jury accurately when he intimated that the jury would think it absurd to award this plaintiff $1.5 million or more in respect of future earnings. The jury could have reasoned that if invested in long term tax exempt municipal bonds paying 7% per annum, for example, a $1.5 million lump sum award could be expected to yield more than $100,000 per year and quite possibly leave plaintiff, at his death, still a millionaire (in dollars of the day), if he managed to avoid invading his capital for living expenses. In the Eastern District of Kentucky, at least, it will probably take a good many years of high inflation before most people will feel railroad hands cannot make do on less than $100,000 a year.

Still, the thought processes of juries in Eastern Kentucky are no more susceptible to divination by outside agencies than are those of juries elsewhere, and we need not rest our decision on the proposition that any instructional error committed by the trial court in this case was harmless. Given the nature of the expert testimony presented here, and in view of the court's failure to give a present value charge, we think it would have been potentially more confusing for the jury to be told it could take inflation into account than to be told otherwise.

Conceptually, to be sure, it would have been perfectly appropriate for the plaintiff's expert witness to have factored inflation (or deflation) into his future earnings estimate, if there had been some rational basis for predicting what the future inflation or deflation would amount to and when it would occur, and if the witness discounted the projected future earnings by an interest rate reflecting comparable assumptions as to the future course of the dollar. This is not what Dr. Cobb claimed to have done, of course: he admitted that he could not predict what the rate of inflation would be in the future, he said he did not take inflation into account in projecting plaintiff's future earnings, and he said he did not discount those earnings to present value with the kind of interest rate likely to obtain in a world where investors assume there is at least some risk of inflation.

If plaintiff had proffered testimony to the effect that inflation could be expected to push his earnings up for 40 years or more at a compound annual rate of more than 7% (that being the inflation rate assumed by Dr. Cobb for one relatively minor part of his economic model), such testimony might have been subject to objection—at least if plaintiff's expert witness did not use a correspondingly high discount rate in reducing estimated future earnings to their present value. See *Petition of United States Steel Corp.*, 436 F.2d 1256 (6th Cir. 1970), *cert. denied*, 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971) and *Bach v. Penn Central Transportation Co.*, 502 F.2d 1117 (6th Cir.1974), where this court indicated that testimony projecting significant wage increases far into the future is so speculative as to be inadmissible. Even

if such testimony is inadmissible, however, it is well established that the jury may normally consider the possibility of future increases or decreases in the purchasing power of money. Thus in *Bach v. Penn Central Transportation Co.,* 502 F.2d 1117, *supra,* we held that "[e]ven though no expert testimony on inflation and future increases was admitted, it was still error for the district court to charge the jury that it should not consider 'future increases or decreases in the purchasing power of money.'" *Id.* at 1122. *Cf. Morvant v. Construction Aggregates Corp.,* 570 F.2d 626 (6th Cir.), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978), where we held it was reversible error to exclude expert testimony on the prospect of future wage increases.

■ It is equally clear, on the other hand, that the plaintiff in an FELA case is not entitled to recover more, in respect of lost future income, than the present value of such income, and the jury ought to be so advised. *St. Louis Southwestern Railway Co. v. Dickerson,* 470 U.S. 409, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985). To let the jury take the prospect of future inflationary wage increases into account without clear guidance on the need for reducing future earnings to their present value would be grossly unfair to the defendant.

That unfairness would be particularly striking in the case at bar, where the only inflation rate ever mentioned was 7.24%, and where the jury, unless cautioned otherwise, could have inferred it was free to project that rate into the future for a period of 40 years or more. Without a proper present value instruction, this could have led to utterly ludicrous results—particularly in view of Dr. Cobb's testimony that a rough approximation of the earning loss could be arrived at by aggregating undiscounted annual earnings. In describing that rough approximation technique, which corresponds to the "total offset" approach discussed in *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983), Dr. Cobb did not intend to suggest, of course, that it would be appropriate to aggregate annual earnings

after they had been adjusted upward for inflation. On the record of this case, however, Dr. Cobb having testified repeatedly that inflation made no significant difference, the jury might well have been confused by an instruction inviting it to take inflation into account.

■ Because of Dr. Cobb's testimony, we think it unnecessary to remand the case for a new trial in which the jury would be told both that it could take into account the possibility of future inflation and that projected future earnings must be discounted to their present value. Advice from the trial court as to these two countervailing considerations would have added little or nothing to the jury's deliberations, because plaintiff's own evidence indicated that inflation in projected earnings is "washed out" by the inflation component of the interest rate used in present value calculations, and inflation therefore makes no difference in the determination of the value of future earnings. (We note also that although the "total wash-out" or "total offset" concept has not been accepted as a mandatory federal rule of decision, it is prominently featured on the menu of economic theories from which courts may currently choose in FELA cases. *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768, *supra.* The "total offset" method of calculating the present value of future earnings depends on the validity of the method's implicit assumptions as to the relationship between the future course of wage rates and the future course of interest rates, and the time may come when those assumptions will be thought so wide of the mark that the method will have to be abandoned. In the case at bar, however, there is affirmative—and uncontradicted—evidence that the assumptions are currently tenable.)

■ A federal appellate court reviewing a challenge to jury instructions is "required to judge the charge as a whole and to affirm the jury verdict if, taken as a whole [the trial court's charge] fairly presents the law as it applies to the case at hand." *Haislah v. Walton,* 676 F.2d 208, 212 (6th Cir.1982). Taking as a whole the charge

given in this case, and considering it in relation to the evidence that was before the jury, we think the judgment entered on the jury's verdict ought to be affirmed. The charge as given would have permitted the jury to award roughly $1.5 million for future lost earnings, if the jury had taken all of plaintiff's evidence at face value, and we are not persuaded that the charge, read in the light of the testimony, entitles plaintiff to another shot at a higher verdict.

AFFIRMED.