**CLARKSVILLE–MONTGOMERY COUNTY SCHOOL SYSTEM, Plaintiff–Appellant,**

v.

**UNITED STATES GYPSUM COMPANY, Defendant–Appellee,**

National Gypsum Company, Defendant.

No. 89–6325.

United States Court of Appeals, Sixth Circuit.

Feb. 21, 1991. Nunc Pro Tunc Jan. 10, 1991.

Rehearing Denied March 19, 1991.

See also 710 F.Supp. 1157.

Ross H. Hicks, Clarksville, Tenn., Daniel A. Speights (argued), Speights & Runyan, Hampton, S.C., for plaintiff-appellant.

Darryl G. Lowe, Lowe, Hogan, Shirley & Yeager, Knoxville, Tenn., Raymond T. Cullen (argued), Michael R. Libor, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant-appellee.

## ORDER

The opinion originally filed on January 10, 1991 is withdrawn as inadvertently issued and a substitute opinion is filed *nunc pro tunc.*

Before KEITH, KRUPANSKY and SUHRHEINRICH, Circuit Judges.

KEITH, Circuit Judge.

Plaintiff Clarksville–Montgomery County School System ("Clarksville") appeals from the district court's April 17, 1989 judgment entered pursuant to a jury verdict in favor of defendant United States Gypsum Co. ("U.S. Gypsum") in this products liability action for negligence, public misrepresentation, fraudulent misrepresentation and concealment. Clarksville assigns numerous errors to the district court's evidentiary determinations and contends that the district court erred in charging the jury. Upon consideration of the issues presented by this appeal, we AFFIRM the jury's verdict.

### I.

#### A.

From 1955 to 1972, U.S. Gypsum manufactured Audicote, a cementitious acoustical plaster sprayed onto ceilings. Four of Clarksville's buildings,[1] constructed between 1966 and 1970, were treated with Audicote which contained approximately 8% chrysotile asbestos, perlite, talc, clay and other ingredients in a wet form. In 1982, the Environmental Protection Agency ("EPA") issued a regulation requiring every school district in the country to inspect for the existence of friable asbestos by June 1983. *See* 40 Fed.Reg. 23360. Clarksville subsequently employed consultants to conduct a survey of its schools and scheduled the removal of Audicote from its buildings to take place from 1983 to 1987. During renovation or demolition of buildings, all asbestos-containing materials must be separately removed with stringent precautions. *See* Standard for Demolition and Renovation: Procedures for Asbestos Emission Control, 40 C.F.R. § 61.147. The total cost Clarksville incurred, including survey and inspection, architectural services, and removal and replacement of asbestos ceiling plaster and other contaminated

---

1. Between 1966 and 1970, Clarksville constructed four school buildings which are the subject of this suit: New Providence Middle School (1966), Montgomery Central High School (1968), East Montgomery Elementary School (1968), and Northwest High School (1970).

material, was $1,618,135.12.[2]

Clarksville filed suit on April 5, 1984, alleging that Audicote was defective[3] and unreasonably dangerous because, from the time it was installed, it created an imminent health hazard to building occupants. Clarksville also claimed that U.S. Gypsum was negligent in manufacturing Audicote because it created a health risk to building occupants. U.S. Gypsum denied that Audicote created any risk of harm and stated that Audicote was manufactured according to the state of the art and industry customs and standards. The case was tried on theories of strict liability, negligence, public misrepresentation, fraudulent misrepresentation and concealment.

Clarksville's architects, Mr. John Shaver and Mr. Robert McKay of Shaver & Company, knew Audicote contained asbestos when they specified the product for Clarksville's schools. They used it because of its acoustical properties, aesthetic appearance, high light reflectance and low cost.[4] Clarksville's architects also testified that use of asbestos and asbestos-containing products was required by state and local codes. Joint Appendix at 577 (McKay trial testimony). The architects testified that they referred to federal and state codes, regulations and ordinances in preparing the specifications. The architects, who had pri-

or experience with Audicote, did not rely upon any U.S. Gypsum statements or representations in deciding to use the product. After researching technical data regarding acoustical, optical and fire proofing properties, Shaver & Company routinely included Audicote in the specifications for school construction. Asbestos was widely used in construction products in the 1960s and early 1970s.

Exposure to high levels of asbestos has been associated with certain diseases. Dr. Peter Elmes, a specialist in asbestos-related diseases, testified that when Clarksville's buildings were constructed, the medical and scientific communities did not connect any risk to occupants or workers in buildings with asbestos-containing products. Joint Appendix at 412 (Elmes trial testimony). In 1972, the general consensus of the medical and scientific communities was that any risk associated with asbestos-containing products was confined to individuals with very heavy and extended industrial exposure to asbestos.[5]

When Clarksville's buildings were constructed, the American Conference of Governmental Industrial Hygienists had established a safety threshold limit value ("TLV") of five million particles per cubic foot (30 fibers per cubic centimeter of air) for exposure to asbestos.[6] The TLV was a

---

**2.** Ceiling material in some of Clarksville's buildings had fallen off or sustained water damage because the roofs had not been properly maintained. U.S. Gypsum claims that Clarksville attempted to upgrade and repair its buildings at U.S. Gypsum's expense.

**3.** Clarksville claimed that Audicote was defective because it contaminated school property with millions of asbestos fibers.

**4.** Robert McKay was responsible for the product specifications that were prepared for Clarksville's schools. He testified that in 1966, the fact that Audicote contained asbestos would have been considered a virtue. The fire proof quality of asbestos permitted wiring and heat conditions that would have been otherwise impossible. Joint Appendix at 585–86 (McKay trial testimony).

**5.** According to Dr. Elmes, the general consensus in medical and scientific communities regarding asbestos exposure remained largely unchanged from 1972 through 1987. He testified that "[t]he generally accepted professional medical

opinion in 1987 was that there was no increased risk of asbestos-related disease from exposure to asbestos-containing products in buildings." Joint Appendix at 413. Experts in asbestos-related diseases have not found any evidence of people suffering from such diseases as a result of merely occupying a building containing asbestos products. Joint Appendix at 419.

**6.** It is generally accepted that one million particles per cubic foot is equivalent to six fibers per cubic centimeter. The 1946 TLV of five million particles per cubic foot for asbestos remained unchanged until 1968. In 1968, the asbestos TLV was lowered to two million particles per cubic foot. This change represented a decrease from 30 fibers per cubic centimeter to 12 fibers per cubic centimeter. In 1972, the TLV was lowered to five fibers per cubic centimeter. The current permissible exposure level for asbestos set by the Occupational Safety and Health Administration is 0.2 fiber per cubic centimeter. Joint Appendix at 564–65 (Smith trial testimony).

level of asbestos to which it was believed workers could be exposed daily for their entire working lives without suffering any adverse health effects. The Occupational Safety and Health Administration ("OSHA") adopted the TLV and renamed it the permissible exposure limit ("PEL").

Dr. Elmes testified that the concentration of asbestos in the air in Clarksville's schools before the ceiling plaster was removed was up to ten thousand times lower than the TLV standard of 30 f/cc. Joint Appendix at 433. He further testified that the technology to measure and accurately identify the ultra-low levels of asbestos in air concentration found in typical buildings, which is at or near the levels found in outdoor ambient air, did not exist until the 1970s.

Dr. Ralph Smith, an industrial hygiene specialist who participated in setting the asbestos TLVs from 1960 to 1972, testified that at the time Audicote was sold, medical doctors, industrial hygienists and scientists believed that building occupants would not be at risk of asbestos-related diseases from exposure to asbestos-containing products in buildings. Drs. Smith and Elmes indicated that epidemiological and toxicological studies fail to demonstrate a correlation between asbestos-related diseases and exposure to asbestos in air concentrations typically found in buildings. The exposure of building users to asbestos-containing products is so low that medical doctors have not seen an increased incidence of asbestos-related diseases from exposure to the chrysotile asbestos-containing products used in buildings, despite the fact that such products have been used since the 1920s. Clarksville's analysis of samples of dust from vacuum cleaners and ventilation filters indicated that there had not been any contamination or release of fibers by Audicote.

### B.

On April 17, 1989, the district court entered judgment pursuant to a jury verdict in favor of U.S. Gypsum. After an eight-day trial, the jury answered special interrogatories finding that: (1) U.S. Gypsum's acoustical plaster, Audicote, was neither defective nor unreasonably dangerous; (2) U.S. Gypsum was not negligent in including asbestos in Audicote, in the testing of its product, in not placing a warning on the product, or in not providing instructions concerning maintenance of its product; (3) U.S. Gypsum did not make any public misrepresentations concerning Audicote; and (4) U.S. Gypsum did not commit fraud or conceal any material facts concerning Audicote. Clarksville filed a motion for a new trial which the district court denied in its September 20, 1989 order. On October 18, 1989, Clarksville filed a timely notice of appeal.

### II.

### A.

Clarksville assigns error to the district court's admission of Dr. Andrew Churg's video deposition.[7] Clarksville argues that it was substantially prejudiced by Dr. Churg's testimony because the deposition was taken five years prior to trial. Moreover, Clarksville claims that U.S. Gypsum failed to show that other experts with similar qualifications were unavailable. U.S. Gypsum counters that Clarksville failed to object to Dr. Churg's video deposition testimony in a timely fashion; therefore, the district court properly determined that Clarksville waived any objections to the use of the testimony. We find U.S. Gypsum's argument persuasive.

During discovery, U.S. Gypsum served Clarksville with its list of witnesses which included notice that it would proffer Dr. Churg's testimony in the form of a videotape deposition.[8] The district court's Janu-

7. Dr. Andrew Churg was deposed on October 15, 1985 in relation to *Kershaw County Board of Education v. United States Gypsum Co.*, No. 85–C.D.–28–58 (C.P., Kershaw County, S.C.). The jury in the instant case viewed the videotaped deposition which was admitted into the record.

8. Prior to serving Clarksville with its witness list, U.S. Gypsum listed Dr. Churg as a potential witness in this case. On January 31, 1989, U.S. Gypsum served Clarksville with its *List of Deposition Testimony Designated for Use at Trial,*

ary 27, 1989 scheduling order provided that objections or motions *in limine* to deposition designations were to be filed by February 24, 1989. Joint Appendix at 95 (Revised and Amended Scheduling Order). Clarksville neither objected to the use of the videotape nor redeposed Dr. Churg.[9] Rather, on February 6, 1989, Clarksville filed and served its counter-designations of Dr. Churg's videotape deposition, indicating that this testimony would be "edited in accordance with an agreement of the parties in this case." Joint Appendix at 108 (counter-designation of testimony of Andrew Marc Churg).

At trial, Clarksville raised its objection to the videotape deposition because Dr. Churg was not unavailable. *See* Fed.R.Evid. 804(b)(1). The district court overruled Clarksville's objection. Joint Appendix at 592–93 (transcript of bench conference). Clarksville again objected to Dr. Churg's testimony in its motion for a new trial. The district court ruled that Clarksville failed to make a timely objection to the admission of Dr. Churg's deposition testimony and thereby waived its right to challenge the deposition. Joint Appendix at 63 (order denying motion for new trial). We find the district court's decision to overrule Clarksville's objection to the Churg deposition to be an exercise of sound discretion.

■ Federal Rule of Civil Procedure 16 affords district courts broad discretion in fashioning scheduling orders. One of the original purposes of Rule 16 was to promote familiarity with the issues actually involved in the lawsuit "so that parties can accurately appraise their cases and substantially reduce the danger of surprise at trial." 6A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 1522, at 218 (1990). When properly applied, Rule 16 aids in the elimination of extraneous disputes from a case, thereby expediting the determination on

the merits. *Id.* at 219. Rule 16(f) provides, in pertinent part: "If a party or party's attorney fails to obey a scheduling or pretrial order ..., the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just...." Rule 16(f) specifically enumerates certain sanctions that may be appropriate when scheduling and pretrial orders are not followed. The references in Rule 16(f), however, are not exhaustive. Fed.R.Civ.P. 16 (Advisory Notes regarding 1983 amendment). In addition to assessing costs and attorney fees, a wide range of sanctions short of dismissal or default are available to courts. *See* 6A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 1531, at 314 (1990). Refusal to consider an objection made in contravention of a district court's scheduling order is merely one suitable sanction. The district court has discretion to impose whichever sanction it feels appropriate under the circumstances. *See United States v. Rayco, Inc.*, 616 F.2d 462, 464 (10th Cir.1980) (broad powers of enforcement inure to a pretrial order limiting issues to be tried and evidence to be introduced). Its action is reviewable under the abuse of discretion standard. *Cf. National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976) (per curiam) (abuse of discretion standard of review applied to district court's dismissal of antitrust action pursuant to Fed.R.Civ.P. 37 for party's failure to comply with discovery order).

The district court's January 27, 1989 revised and amended scheduling order provided in pertinent part:

> At least by January 31, 1989, the parties will disclose to each other any depositions which they intend to read into evidence at the trial and will designate portions of such depositions to read by

notifying Clarksville that Dr. Churg's testimony would be used at trial.

Clarksville's counsel was present at the videotape deposition and questioned Dr. Churg extensively. Appellee's Brief at 21.

9. Clarksville did not object or timely move *in limine* to use of the deposition in compliance with the district court's scheduling order. The matter was not raised at the pretrial conference held on March 10–11, 1989; nor did Clarksville inform the district court of its objection in the pretrial brief filed March 24, 1989.

line and page. Counter designations of depositions will be made by line and page on or before February 6, 1989.

\* \* \* \* \* \*

Motions in limine, all pretrial motions, motions regarding objections to trial exhibits, motions regarding *objections to depositions and counter deposition designations* and all other pretrial motions shall be filed on or before February 24, 1989.

Joint Appendix at 95 (*Clarksville–Montgomery County Board of Education v. United States Gypsum Co.*, No. 3–84–0315 (M.D.Tenn. Jan. 27, 1989) (Revised and Amended Scheduling Order) (emphasis added)). Clarksville's objection *at trial* to Dr. Churg's testimony was in clear contravention to the district court's scheduling order. Had Clarksville complied with the scheduling order, the matter could have been timely addressed by the court. If, for example, the district court had sustained Clarksville's objection to Dr. Churg's testimony prior to the trial's commencement, U.S. Gypsum would have been better situated to make alternative plans for presentation of expert testimony. Instead, Clarksville's counter-designation of Dr. Churg's deposition provided the district court and U.S. Gypsum with every indication that the admission of the videotape deposition was not objectionable. The record fails to evidence an adequate explanation for Clarksville's sudden change of position at trial regarding the admissibility of Dr. Churg's deposition. Thus, we hold that the district court did not abuse its discretion in finding that Clarksville's failure to timely object to the

deposition constituted a waiver of its right to challenge the testimony at trial.

### B.

Clarksville claims that the district court committed fundamental error in allowing the introduction of the minutes of a meeting of the National Cancer Institute ("NCI") held in 1944, while excluding "far more relevant documents." Appellant's Brief at 26. Finding the district court's evidentiary rulings proper, we reject this argument.

■ The district court's admission of the evidence, pursuant to Fed.R.Evid. 402[10] and 403,[11] as relevant and useful in avoiding jury confusion was proper. Admission of relevant but potentially prejudicial or confusing evidence is placed within the district court's sound discretion. *Finch v. Monumental Life Ins. Co.*, 820 F.2d 1426, 1432 (6th Cir.1987). In reviewing the district court's decision on this issue, we must "look at the evidence in a light most favorable to its proponent, maximizing its probative value" and, in this case, minimizing its effect of confusing the jury. *See United States v. Brady*, 595 F.2d 359, 361 (6th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979); *see also Turner v. Allstate Ins. Co.*, 902 F.2d 1208, 1214 (6th Cir.1990).

### 1.

■ At the March 11, 1989 pretrial conference, the district court was presented with the Saranac documents.[12] Specifically finding that the Saranac documents do not evidence U.S. Gypsum's participation in a conspiracy to suppress asserted evidence of a link between asbestos and cancer[13] as

---

10. Federal Rule of Evidence 402 provides: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible."

11. Federal Rule of Evidence 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or *misleading the jury*, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence." (Emphasis added.)

12. Several asbestos companies, including U.S. Gypsum, contracted with Saranac Lake Laboratories and Dr. Leroy U. Gardner to perform animal experiments with asbestos dust. The Saranac documents include the laboratory report and letters concerning that report. Joint Appendix at 458 (Wolfe trial testimony).

13. The Saranac documents show that high-dosage asbestos experiments were performed on several species of animals, including cats, dogs,

alleged by Clarksville, the district court ruled that the Saranac documents, although authentic, would be admissible for the limited purpose of showing that U.S. Gypsum had actual notice of the hazards of asbestos.

At trial, the district court permitted Clarksville to use certain Saranac documents, over U.S. Gypsum's objections, during the cross-examination of Christopher Wolfe. Clarksville introduced into evidence a letter ("P–14") from Vandiver Brown of Johns–Manville Corporation in 1948 which sets forth reasons supporting his argument that the reference to cancer in the Saranac report should be omitted. Based on this evidence, Clarksville advanced the inference that these and other exhibits demonstrated a conspiracy to suppress a report possibly linking asbestos to cancer.

U.S. Gypsum sought to exclude the Saranac documents, including P–14. U.S. Gypsum argued that the Saranac documents were hearsay and were not probative of any issue. After the district court admitted certain Saranac documents, including P–14, U.S. Gypsum sought to rebut and explain the confusing evidence by introducing the National Cancer Institute meeting minutes of January 1944 ("D–534") and a 1943 letter from Dr. Gardner to Mr. Brown accompanying Dr. Gardner's interim report ("D–526") to show that there was no wrongful suppression of a purported asbestos-cancer link.[14]

U.S. Gypsum argued that D–526, which consisted of Dr. Gardner's letter and his interim report, and D–534, which consisted of the NCI meeting minutes, should be admitted because they evidence sound reasons for eliminating the reference to a link between cancer and asbestos in Dr. Gardner's report. The exhibits indicated that Dr. Gardner's experiments were not directed towards determining the incidences of cancer as a result of asbestos dust exposure. Joint Appendix at 1048. In addition, D–526 confirmed that Dr. Gardner believed that an investigation of possible incidences of cancer caused by asbestos dust exposure should be the subject of a separate study. Joint Appendix at 1036. Moreover, the exhibits confirmed that Dr. Gardner believed that the question of cancer susceptibility should be omitted from the Saranac reports because certain strains of white mice developed tumors without apparent cause and one such strain was unintentionally used in his experiment. Joint Appendix at 1049, 1059.

After reviewing the documents admitted into evidence, we find that the district judge did not abuse his discretion. The district court, over Clarksville's objection, admitted: the 1943 letter from Dr. Gardner to Mr. Brown; Dr. Gardner's interim report; and the NCI minutes. The district court admitted these exhibits into evidence to allow the jury a more complete understanding of Clarksville's exhibits previously admitted during the cross-examination of Christopher Wolfe. The district court properly determined that it would be unfair

---

rats, guinea pigs, and an uncontrolled strain of eleven white mice. Dr. Gardner produced an interim report suggesting a relationship to cancer only because tumors developed in some of the white mice. Dr. Gardner was uncomfortable with the preliminary suggestions of an asbestos-cancer link and suggested that the cancer reference be omitted. Some sponsors agreed that the cancer references should be excluded. The final report, published after Dr. Gardner's death, made no reference to cancer in white mice.

**14.** The relevant language of Dr. Gardner's letter to Mr. Brown states: "The question of cancer susceptibility now seems more significant than I had previously imagined.... As it will take two or three years to complete such a study, I

believe it would better be omitted from the present report." Joint Appendix at 1036.

In 1943, Dr. Gardner brought his preliminary white mice data to the attention of the NCI, the highest governmental agency concerned with cancer. The NCI minutes admitted into evidence reflect that there was no suppression of the asbestos-cancer findings. Contrary to Clarksville's interpretation of the Saranac documents, the NCI received Dr. Gardner's information, reviewed it, and rejected his application for money to conduct cancer studies. See Joint Appendix at 1058–61. U.S. Gypsum offered the NCI minutes as evidence that Dr. Gardner's white mice data were not accepted as proof of an asbestos-cancer link. Thus, NCI's rejection of Dr. Gardner's findings provided rebuttal evidence regarding Clarksville's conspiracy theory.

for Clarksville to argue, without U.S. Gypsum's rebuttal evidence, the inference that U.S. Gypsum had knowledge of an alleged link between cancer and asbestos dust and conspired to suppress this knowledge, as evidenced by Dr. Brown's letter indicating that the references to cancer should be omitted. The district court, therefore, permitted U.S. Gypsum to introduce evidence of Dr. Gardner's view of the relevant data which clarified Dr. Brown's rationale for omitting the data. In making its ruling, the district court stated:

I think the whole picture needs to be there ... and to this extent, I'm going to reverse my former ruling to allow both of you to argue the possible inference from the Vandiver Brown 1948 letter, and I'm going to allow the letter from Dr. Gardner to Vandiver Brown, February 24, 1943 along with the attached report, as well as the National Institute of Health document.

Joint Appendix at 631. Each party argued to the jury its interpretation of the documents. The district court's exercise of its discretion was sound.

2.

■ Clarksville also assigns error to the district court's exclusion of Suzanne Torrey's deposition testimony regarding the loss of laboratory research files on Audicote. We conclude that the district court did not abuse its discretion in excluding Torrey's deposition testimony as its probative value was outweighed by its highly prejudicial impact and its cumulative nature.

The Torrey deposition indicates that while employed as in-house counsel for U.S. Gypsum and working on asbestos litigation

in 1980, Torrey secured from the research department laboratory files relating to Audicote.[15] Torrey took a leave of absence from U.S. Gypsum in July 1981; and when she returned, the original files could not be located. In her deposition testimony, Torrey explained that copies of the research reports were produced to Clarksville's counsel.[16] Torrey testified that the only documents that were not available because of the loss were incidental memoranda and handwritten notes which did not relate to the alleged hazards of asbestos. At trial, Christopher Wolfe acknowledged that the original Audicote laboratory files were checked out by Torrey and subsequently lost. Wolfe, however, indicated that U.S. Gypsum furnished Clarksville with copies of the research files.

The Torrey deposition was cumulative and properly excluded under Fed.R.Evid. 401, 403. Such testimony did not relate to the merits of the instant case. The district court viewed Clarksville's proffer as an attempt to impugn U.S. Gypsum's conduct in a prior case. While finding this testimony highly prejudicial, the district court found that it had no probative value with regard to Audicote's defective or dangerous nature. Torrey's deposition testimony does not evidence U.S. Gypsum's failure to provide documents critical to Clarksville's proof of the hazards of asbestos. Thus, the district court's decision to exclude the Torrey deposition does not constitute an abuse of discretion.

Our review of the record does not indicate that the district court abused its discretion in excluding the other exhibits identified by Clarksville in its brief. In sum, we find no evidentiary rulings which warrant reversal.[17]

---

**15.** The research reports were copied onto microfilm. However, the hard copies secured by Torrey included memoranda and handwritten notes which were not copied onto microfilm. Joint Appendix at 258 (Torrey deposition).

**16.** Christopher Wolfe's trial testimony confirmed this fact. Joint Appendix at 474.

**17.** To the extent that Clarksville relies on such documents regarding alternatives and substitutes to Audicote to show that asbestos-free alternatives were available, the proffered evidence

was properly excluded as cumulative. Lane Lyle and George Hitchcock provided ample testimony on these matters. In addition, post-sale documents which address attempts to reformulate products without asbestos were properly excluded pursuant to Rule 407 which provides, in pertinent part: "When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable con-

## C.

■ Clarksville next argues that the district court erred in denying its motion for a new trial based on Edwin Jakaki's ("Jakaki") testimony which was given in violation of the district court's sequestration rule. As the district court admonished the jury to disregard Jakaki's testimony and Clarksville refrained from moving for a mistrial, we find Clarksville's claim that it was prejudiced unpersuasive.

U.S. Gypsum called Jakaki, a research manager for the Building Plasters Laboratory, as a witness. Jakaki, who had been affiliated with U.S. Gypsum for more than thirty-one years, testified on a broad range of topics.[18] In the midst of Clarksville's cross-examination, Jakaki admitted that he had reviewed a transcript of Christopher Wolfe's testimony in the instant case, in direct violation of the district court's sequestration rule. The district court *sua sponte* excused Jakaki, struck his testimony from the record, and admonished the jury not to consider it.[19]

The district court asked Clarksville whether, in light of Jakaki's violation of the sequestration rule, it would move for a mistrial. Clarksville's counsel declined to move for a mistrial, stating:

> Your Honor, [the option of moving for a mistrial] puts Clarksville between a rock and a hard place through no fault of its own. I think we're entitled to a mistrial. Clarksville now has invested thousands and thousands of dollars and weeks of time and school teachers and

everything else, and Clarksville wants this case completed. *So we're not going to move for one. I do not wish to suggest that in the event we should lose this case, we don't think this is a basis for a new trial.* Because I think Clarksville, without question, has been prejudiced despite the strong admonition of the Court....

> So we're not asking for a mistrial because at this time, just as a practical matter, that's the position in which we're placed.

Joint Appendix at 550 (emphasis added).

■ Attorney misconduct that results in prejudice may serve as a basis for a new trial. *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir.1980). However, where such prejudice is cured by instructions of the court, the motion for a new trial should be denied. *See Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988). The burden of showing harmful prejudice rests on the party seeking the new trial. *Holman v. Mark Indus., Inc.*, 610 F.Supp. 1195, 1199 (D.Md.1985), *aff'd*, 796 F.2d 473 (4th Cir. 1986); *see also* 11 C. WRIGHT and A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2803, at 32 (1973). District courts are afforded broad discretion in deciding whether to grant a motion for a new trial. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980) (per curiam) ("The authority to grant a new trial ... is confided

---

duct in connection with the event...." Fed.R. Evid. 407.

The documents concerning responses to customer inquiries (P–61) were post-sale. As they do not relate to U.S. Gypsum's state of mind when Audicote was placed in the subject schools, the district court exercised sound discretion in excluding the responses to customer inquiries.

18. For example, Jakaki testified to the physical consistency of Audicote. Joint Appendix at 494, 496. He indicated that when U.S. Gypsum ceased production of Audicote, there were no substitutes available. Joint Appendix at 519. Jakaki maintained that other companies manufactured acoustical plasters that contained asbestos. He asserted that Audicote met federal specifications. Joint Appendix at 510. He also described the effects of water damage on a

ceiling insulated with Audicote. Joint Appendix at 512.

19. The district court admonished the jury as follows:

All right. Ladies and gentlemen of the jury, you will totally disregard everything that this man has said, just disabuse your minds of it. Mr. Jakaki, you will come down from the witness stand. You will not be permitted to testify any further.

Just disregard everything he said. Defense counsel has violated the rule of the court, sequestering witnesses, by giving this man the testimony of another witness who has testified.

I want you to absolutely disabuse your mind of anything this witness has said.

Joint Appendix at 549.

almost entirely to the exercise of discretion on the part of the trial court."). Absent an abuse of discretion, the district court's denial of Clarksville's motion for a new trial should not be disturbed. *Del Rio Distrib., Inc. v. Adolph Coors Co.,* 589 F.2d 176, 179 (5th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979).

We agree with the district court's rationale for denying Clarksville's motion for a new trial. The district court properly determined that its actions—admonishment of the jury to disregard Jakaki's testimony, dismissal of Jakaki in the jury's presence, and informing the jury that U.S. Gypsum had violated a rule of the court—were sufficient to remedy any prejudice which may have accrued against Clarksville as a result of Jakaki's testimony. Thus, Clarksville has failed to sustain its burden of demonstrating that the district court abused its discretion in denying the motion for new trial.[20]

### D.

Clarksville claims that the district court made numerous basic errors in charging the jury. Specifically, Clarksville assigns error to the district court's instruction regarding the rebuttable presumption that a product is not unreasonably dangerous if it is manufactured in compliance with government standards. *See* Tenn.Code Ann. § 29–28–104. The gravamen of Clarksville's claim is that the court's instruction to the jury, that it had heard testimony concerning government standards, was an erroneous comment on nonexistent facts. Accordingly, Clarksville claims that the district court's jury instruction regarding the rebuttable presumption that arises from a manufacturer's compliance with governmental standards constituted prejudicial error.[21] After careful review of the entire

record, we find sufficient evidence and testimony in the record on the issue of governmental standards to find Clarksville's claims meritless.

"The function of the reviewing court with respect to jury instructions is to satisfy itself that the instructions show no tendency to confuse or mislead the jury with respect to the applicable principles of law." *Miller v. Utica Mill Specialty Mach. Co.,* 731 F.2d 305, 307 (6th Cir.1984) (per curiam) (citation omitted). We presume the jury has followed the instructions as given. *See Tucker v. Bethlehem Steel Corp.,* 445 F.2d 390, 392 (5th Cir.1971). When considering the correctness and adequacy of a charge to the jury, we must review the jury instructions as a whole. *Howard v. Chesapeake and Ohio Ry. Co.,* 812 F.2d 282, 287 (6th Cir.), *cert. denied,* 484 U.S. 820, 108 S.Ct. 78, 98 L.Ed.2d 40 (1987). Each instruction must be considered in connection with others of the series referring to the same subject. *See Carruba v. Transit Cas. Co.,* 443 F.2d 260, 264 (6th Cir.1971). A jury instruction which states the law with substantial accuracy and fairly submits the issues to the jury will not provide grounds for reversal. *See Gross v. Nashville Gas Co.,* 608 S.W.2d 860, 872 (Tenn.Ct.App.1980). "The instructions given by the judge to the jury should be directly applicable to the facts in evidence. There must be testimony tending to raise the question in order for an issue to be submitted to the jury." *Wilson v. Tranbarger,* 218 Tenn. 208, 402 S.W.2d 449, 461 (1965) (citations omitted). A substantial and prejudicial error in a single jury instruction may warrant reversal. *Miller,* 731 F.2d at 307. Even where a portion of the charge is erroneous, if the point is explained and corrected in other

---

**20.** As an alternate holding, the district court determined that by declining to move for a mistrial, Clarksville waived its right to seek a new trial based on U.S. Gypsum's violation of the sequestration rule. *See Porterfield v. Burlington Northern, Inc.,* 534 F.2d 142, 146 (9th Cir.1976) (where, as a matter of trial strategy, party failed to move for a mistrial at the time attorney's misconduct came to light, such misconduct did not provide adequate basis for new

trial). Because we hold that the district court did not abuse its discretion in denying the motion for new trial, we need not reach the waiver issue.

**21.** Clarksville argues that the prejudicial effect of the district court's jury instruction was magnified because Jakaki's stricken testimony provided the sole basis for the instruction.

parts of the charge so that the jury will not be misled, the jury's verdict should be affirmed. *See Cincinnati Fluid Power, Inc. v. Rexnord, Inc.*, 797 F.2d 1386, 1391 (6th Cir.1986).

### 1.

With regard to whether Audicote is unreasonably dangerous, the district court instructed the jury as follows:

In this case, you must determine whether at the time it was installed Audicote had the capacity to cause contamination to plaintiff's schools, making it unsafe for application to ceilings in the plaintiff's schools.

In the context of this case, unreasonably dangerous means that a product is dangerous to an extent beyond that which may be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product, because of its dangerous condition, would not be put on the market by a reasonably prudent manufacturer or seller assuming the seller knew of its dangerous condition.

This is, admittedly, not a precise definition. You must weigh the evidence before you and determine, if there is a danger, whether that danger could be considered unreasonable in light of your everyday experience and common sense.

*You have heard testimony in this case concerning standards governing the manufacture of acoustical plasters. If you find that the defendant complied with these regulations or standards at the time its products were manufactured concerning design, inspection or testing, this shall raise the rebuttable presumption that the product is not in an unreasonably dangerous condition in regard to the matters covered by these standards.*

Such a presumption is controlling only in the complete absence of contradicting facts and circumstances. Thus, if there

is evidence in the case contradicting the presumption, the presumption disappears and it's for you the jury to weigh the evidence and to reach what appears to be the most probable conclusion.

Joint Appendix at 670–72 (emphasis added). From our review of the relevant portion of the jury instruction, we find it to be a fair and accurate statement of the law. *See* Tenn.Code Ann. § 29–28–104 ("Compliance by a manufacturer or seller with any federal or state statute or administrative regulation existing at the time a product was manufactured and prescribing standards for design, inspection, testing, manufacture, labeling, warning or instructions for use of a product, shall raise a rebuttable presumption that the product is not in an unreasonably dangerous condition in regard to matters covered by these standards.").

Clarksville, nevertheless, challenges the propriety of the instruction based on the premise that no evidence or testimony addressing Audicote's compliance with any federal or state statute or administrative regulation exists in the record. Clarksville's argument, however, must fail. We admit that the record does not contain an overabundance of evidence on Audicote's compliance with governing standards. However, the existence of a sufficient quantum of evidence and testimony supporting the use of the instruction leads us to conclude that the district court did not commit reversible error. For example, one of Clarksville's architects testified that he and his colleagues referred to federal and state codes, regulations and ordinances in preparing the specifications for the schools. Joint Appendix at 577 (McKay trial testimony). Such testimony created the inference that Audicote's compliance with governing standards was one of many factors considered in preparing the specification. *See* Joint Appendix at 586 (McKay testified that building code inspectors considered asbestos a valuable asset and, therefore, specified its use.). Additionally, the 1968 Sweet's Catalogue,[22] admitted into evidence

---

**22.** The Sweet's Catalog is a collection of books containing technical data submitted by the man-

ufacturer of products for review by architects.

as Plaintiff's Exhibit 58(6), states that Audicote "[c]omplies with Federal Specification SS–A–111, Type I and II." Joint Appendix at 815. This modicum of evidence is a sufficient basis for the district court's instruction regarding the rebuttable presumption.[23]

### 2.

■ Clarksville also claims that the district court's instruction regarding industry standards, given in the absence of supporting evidence, constituted reversible error. Again we disagree with Clarksville's assessment of the evidence and find its contention meritless.

The district court did not err in instructing the jury on U.S. Gypsum's state-of-the-art defense. The relevant portion of the jury instruction reads as follows:

In determining whether Audicote was defective or unreasonably dangerous, you must step back to the period when it was manufactured and sold. You may consider the state of the art that existed at that time. The state of the art is the amount or extent of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury. *You may also consider the customary methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.*

If you find that the defendant was complying with accepted industry standards of the time regarding the care taken in the manufacture and distribution of their products, you may consider this as evidence that Audicote was not defective or unreasonably dangerous. Compliance with industry standards may be evidence that due care was exercised under the circumstances; however, such evidence is not conclusive.

Joint Appendix at 673–74 (emphasis added). Preliminarily, this instruction is a fair and accurate statement of the law. *See* Tenn. Code Ann. § 29–28–105(a), (b);[24] *Abbott v. American Honda Motor Co.*, 682 S.W.2d 206, 211 (Tenn.Ct.App.1984). We are unpersuaded by Clarksville's analysis which isolates the portion of the jury charge referring to "industry standards" and attempts to construct a basis for reversal. We are bound to review the jury instructions as a whole, considering each instruction in connection with others of the series referring to the same subject. *See Carruba*, 443 F.2d at 264. In fulfilling this requirement, we find that the jury instruction regarding U.S. Gypsum's state-of-the-art defense was proper.

There was ample testimony regarding the customary methods, standards and techniques of manufacturing acoustical ceiling plasters to support the jury instruc-

**23.** If, contrary to these facts, we found no evidence or testimony in the record, the instruction standing alone would constitute harmless error. *See Smith v. Detroit Marine Eng'g Corp.*, 712 S.W.2d 472, 475 (Tenn.Ct.App.1985) (harmless error where jury instruction given without supporting evidence on the record). The district court immediately followed the general discussion concerning standards with the statement that if the jury determined that any standards were complied with, and *if* any presumption were created, it was controlling "only in the complete absence of contradictory facts and circumstances." Thus, the district court properly instructed the jury of its role in determining whether the rebuttable presumption was even applicable. The court did not usurp the jury's role by instructing that U.S. Gypsum complied with any standards, what the standards were, or whether the rebuttable presumption was in fact created.

**24.** Tenn.Code Ann. § 29–28–105 provides in pertinent part:

Determination of defective or dangerous condition.—(a) A manufacturer or seller of a product shall not be liable for any injury to person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.

(b) In making this determination the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.

tion. For example, Robert McKay testified that asbestos-containing materials and acoustical plasters were extensively used in the 1960s. Mr. Richard Welty, U.S. Gypsum's Southern Division Quality Manager, testified that he was responsible for ensuring that Audicote and other U.S. Gypsum products met the company's standards, as well as market standards. Thomas Hopen ("Hopen") and Richard Hatfield testified that asbestos was widely used in the manufacture of acoustical ceiling plasters during the 1960s. Hopen also explained that it was "fairly typical" to find chrysotile asbestos in acoustical ceiling plasters. The state-of-the-art jury instructions were directly applicable to the facts in evidence. *See Wilson,* 402 S.W.2d at 461. We, therefore, conclude that the aforementioned testimony provided sufficient evidence regarding Audicote's compliance with customary designs and standards of manufacturing and provided the district court with an ample basis for charging the jury on the state-of-the-art defense.

3.

In the damages portion of the jury instructions, the district court charged the jury that Clarksville had to show that Audicote created a hazard before Clarksville removed the product from its schools. Clarksville, for the first time on appeal, contends that this instruction was an erroneous statement of its burden of proof on the issue of liability. U.S. Gypsum counters, and we agree, that Clarksville mischaracterizes the instruction.

■■■ We first note that Clarksville's failure to object to a specific charge before and after the jury charge is given constitutes waiver of the objection. *See Murphy v. Owens–Illinois, Inc.,* 779 F.2d 340, 345–46 (6th Cir.1985); Fed.R.Civ.P. 51. Were we to reach the merits of this issue, the record indicates that the jury instructions tend not to confuse or mislead the jury regarding the requisite proof for liability. *See Miller,* 731 F.2d at 307. The district

court had previously instructed the jury that Clarksville was required to prove that Audicote was defective or unreasonably dangerous. The district court elaborated that "a product is defective when it has a propensity to cause harm not anticipated by the user." In the damages portion, the district court charged the following:

> In this case, the *measure of damages* is the reasonable cost of repairs necessitated by the presence of asbestos in Audicote and its release of asbestos fibers into the air. Accordingly, ladies and gentlemen, *if on the basis of all the evidence you find that the asbestos in Audicote created a hazard and that the plaintiff's asserted damages reflect the cost of reasonable steps to abate that hazard, you may award the plaintiff damages in the amount of those costs.*

Joint Appendix at 697–98 (emphasis added). The challenged portion of the jury instruction unequivocally addresses the calculation of damages. We, therefore, conclude that Clarksville's assignment of error is without merit.

4.

■■■ Clarksville contends that the district court committed fundamental error in refusing to charge on the EPA's National Emission Standards for Hazardous Air Pollutants ("NESHAPS").[25] 40 C.F.R. § 61, subpart M. The NESHAPS were admitted into evidence and several witnesses testified concerning them. Clarksville reasons that the NESHAPS regulations show that the Audicote in Clarksville's buildings was defective because its disposal involved an extraordinary expense. This theory is flawed because the regulations were enacted after the construction of Clarksville's buildings. They are not probative of whether Audicote was defective or unreasonably dangerous or whether U.S. Gypsum was negligent. Their application is limited to instances when the owner is otherwise performing renovation or demolition of a building.

---

**25.** The NESHAPS are regulations which require asbestos material to be separately removed and disposed whenever a portion of a building involved affects 160 square feet of friable asbestos material.

Regarding the issue of damages, wherein the NESHAPS are relevant, we find the district court's instruction proper. The trial court committed no error in refusing to charge the jury on the NESHAPS. As the jury instructions informed the jury of relevant considerations and provided a basis in law for aiding the jury in reaching its determination, we find Clarksville's complaints about the specific wording of the instructions unpersuasive. *See Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1181 (6th Cir.1983); *see also Gross*, 608 S.W.2d at 873 ("Even were we to find the charge as given to be less than perfect, or the appellants' instruction to be more nearly perfect, which we do not, appellants were not entitled to a perfect charge—'a charge which states the law with substantial accuracy and fairly submits the issues to the jury should not be grounds for reversal' ") (quoting *Davis v. Wilson*, 522 S.W.2d 872, 884 (Tenn.Ct.App.1974)). We, therefore, find that the jury instructions relating to damages covered the applicable law adequately, as they were comprehensive and legally correct.

### III.

Finding the claims raised on appeal to be without merit, we AFFIRM the judgment of Chief Judge Thomas A. Wiseman, Jr. of the United States District Court for the Middle District of Tennessee.