NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

Case Nos. 16-2065/17-1429

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

May 31, 2018
DEBORAH S. HUNT, Clerk

ENCANA OIL & GAS (USA) INC., a
Delaware corporation,

   Plaintiff-Appellant/Cross-Appellee,

v.

ZAREMBA FAMILY FARMS, INC., a
Michigan corporation; ZAREMBA GROUP,
LLC, a Michigan limited liability corporation;
WALTER ZAREMBA, an individual,

   Defendants-Appellees/Cross-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF
MICHIGAN

BEFORE: MOORE, THAPAR, and BUSH, Circuit Judges.

THAPAR, Circuit Judge. At least for a while, the fracking boom came to Michigan. Oil companies started drilling wells, and the going rate for mineral rights went through the roof. Eventually, however, the bubble burst. This case arises from the fallout.

I.

The Zaremba family held the mineral rights to a large amount of drillable land in Michigan.[1] So when the drilling boom began, oil-company suitors began lining up at their door. The Zarembas entered negotiations with two such companies: Encana Oil & Gas ("Encana") and Chesapeake Energy ("Chesapeake"). Eventually, the Zarembas neared a deal with Chesapeake.

---

[1] For convenience, this opinion refers to "the Zarembas" collectively. That moniker refers to all three of the defendant-appellees/cross-appellants: Zaremba Family Farms, the Zaremba Group, and Walter Zaremba.

But that deal fell apart over a dispute about how Chesapeake and the Zarembas would allocate costs.

After the Chesapeake deal unraveled, the Zarembas signed a letter of intent with Encana. The Zarembas and Encana agreed to negotiate a binding lease agreement, and Encana paid the Zarembas $2 million in earnest money. But the letter of intent also said that if the parties did *not* go through with the agreement—for whatever reason—the Zarembas would return $1.8 million of that money to Encana.

The Zarembas and Encana never reached a binding deal. About two weeks after the parties signed the letter of intent, Encana decided to walk away. And that meant the Zarembas had to return the $1.8 million. Yet after Encana walked, an Encana employee mistakenly told the Zarembas they could *keep* the whole $2 million. So when Encana later asked for the $1.8 million back, the Zarembas refused. Encana promptly sued the Zarembas for breach of contract. The Zarembas counterclaimed, arguing that Encana was liable for fraud and fraudulent inducement (among other things not relevant here).

Then, a surprise. About eight months after Encana sued, explosive allegations emerged in the press: Encana and Chesapeake had purportedly colluded to suppress lease prices in Michigan. Reuters published emails in which the two companies' top executives discussed how they might find a way to avoid "bidding each other up" in Michigan. R. 39, Pg. ID 211. These revelations prompted the Zarembas to lodge a counterclaim against Encana for violations of the Sherman Antitrust Act and the Michigan Antitrust Reform Act.

After several years of litigation, the district court granted Encana summary judgment on the Zarembas' antitrust claims. But Encana's breach-of-contract claim and the Zarembas' fraud

claims went to trial. The jury ultimately determined that Encana had waived its right to recoup the $1.8 million, but that the Zarembas had failed to prove their fraud counterclaims.

Both parties now appeal. The Zarembas claim the district court erred in dismissing their Sherman Act claim on summary judgment. They also claim that they were entitled to judgment as a matter of law on their fraud counterclaims, and that the district court should have granted their motion for a new trial because Encana's expert witness misled the jury. For its part, Encana claims it was entitled to judgment as a matter of law on its breach-of-contract claim, and that the district court wrongly instructed the jury on that claim.

## II.

We turn first to the Zarembas' antitrust claims. The Sherman Act outlaws agreements that "unreasonably" restrain trade. *United States v. Joint-Traffic Ass'n*, 171 U.S. 505, 559 (1898) (interpreting 15 U.S.C. § 1). Whether a restraint is reasonable typically depends on the aptly named "rule of reason," which necessitates an "elaborate inquiry" into the restraint's effect on competition in the relevant market. *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 343 (1982). But the rule of reason has limits. Some kinds of agreements are so likely to have a "pernicious effect on competition" that they are "conclusively presumed to be unreasonable." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). For instance, sellers of "sanitary pottery" (*i.e.*, toilets) cannot get together and decide that they will sell their wares only for a given amount. *United States v. Trenton Potteries Co.*, 273 U.S. 392, 394, 397–98 (1927). Price fixing of that kind is "per se" unlawful. *N. Pac.*, 356 U.S. at 5.

The Clayton Act creates a private cause of action for violations of the antitrust laws. *See* 15 U.S.C. § 15. The claimant must prove that his opponent entered into an agreement that is per se unlawful, and that the agreement in fact caused the claimant to suffer an "antitrust injury."

*See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344–45 (1990). An antitrust injury is an injury that is "of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." *Id.* at 334 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Here, the Zarembas allege Encana engaged in two kinds of per se unlawful conduct. First, they argue that Encana and Chesapeake engaged in an unlawful "bid rigging" scheme whereby the two companies agreed not to outbid each other for the Zarembas' leases. *See United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 325 (4th Cir. 1982) (defining "bid rigging" as "[a]ny agreement between competitors pursuant to which contract offers are to be submitted to or withheld from a third party"); *see also United States v. Green*, 592 F.3d 1057, 1068 (9th Cir. 2010) (holding that "bid rigging" is per se illegal and citing cases from the Fifth and Tenth Circuits in agreement). Second, the Zarembas argue that Encana and Chesapeake engaged in illegal "market allocation" by dividing up the Michigan mineral-rights market, rather than competing with each other for it. *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990) (per curiam) (holding that "agree[ments] to allocate markets" are per se unlawful). To prevail, the Zarembas have to show that Encana entered into one or both of these agreements and that they suffered a resulting "antitrust injury." *Atl. Richfield*, 495 U.S. at 344–45. The question at summary judgment, of course, is whether the Zarembas produced sufficient evidence for a reasonable juror to reach that conclusion. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Because "antitrust law limits the range of permissible inferences from ambiguous evidence," they must point to evidence that "'tends to exclude the possibility' that the alleged conspirators acted independently" if they are to succeed. *Id.* (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Here, the Zarembas advance three distinct theories.

*Theory One: The Poison Pill.*[2]  The Zarembas first argue that just as they were preparing to finalize their deal with Chesapeake, Encana and Chesapeake agreed to rig the bidding.  So, they claim, Chesapeake tanked the Zaremba deal by inserting a "poison pill," forcing the Zarembas to sign with Encana instead.

In support of this theory, the Zarembas point to the following evidence.  Emails between top Encana and Chesapeake executives show that at the same time they were negotiating with the Zarembas, the two companies were indeed interested in colluding.  At one point, Chesapeake's CEO suggested that the companies "throw in 50/50 together" instead of "bash[ing] each other's brains out on lease buying."  R. 379-13, Pg. ID 7118.  Encana's CEO responded that he was "open to any ideas to reduce costs."  *Id.*, Pg. ID 7115.  Later, an Encana executive wrote to Encana's CEO that the company "appear[ed] to have agreed" to a "division of work" with Chesapeake.  R. 379-18, Pg. ID 7130.  And the companies subsequently haggled over a draft "Area of Mutual Interest" agreement.  R. 379-21, Pg. ID 7140–45.  That agreement contemplated a scheme whereby the companies would "agree not to compete against one another" in designated geographic areas.  *Id.*, Pg. ID 7141.

Troubling stuff.  But what does that evidence have to do with the Zarembas?  Well, email records confirm that at the same time the companies were contemplating collusion, each was also negotiating for the Zarembas' mineral-rights leases.  The Zarembas claim these negotiations eventually resulted in an agreement in principle between the Zarembas and Chesapeake.  In support, they point to an email in which Chesapeake's CEO instructed an employee to "sign [the Zarembas] up I guess."  R. 379-10, Pg. ID 7104.  But then, on the day Chesapeake and the Zarembas had planned to close their deal, two high-level executives at Chesapeake and Encana

---

[2] Not to be confused with the poison pill of Delaware lore.  *See, e.g.*, *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361 (Del. 1995).

had what the Zarembas believe was a crucial phone call. During that call, those executives discussed their potential non-compete agreement. And the Zarembas say that, as a result, Chesapeake agreed to tank the Chesapeake-Zaremba deal by reneging on an earlier assurance that Chesapeake would bear all the "post-production costs" from the Zaremba wells. In the end, the Zarembas claim that Chesapeake's production-costs "poison pill" forced them to walk away from the Chesapeake deal and instead sign the letter of intent with Encana, which set out "far inferior" lease terms. Second Br. 24.

From all this, the Zarembas argue that a reasonable juror could conclude that Encana and Chesapeake struck a deal in which they agreed that Chesapeake would walk away from negotiations with the Zarembas, forcing them into Encana's arms. But, the Zarembas' evidence does not "tend[] to exclude the possibility" that Encana and Chesapeake had not yet reached an anti-competitive agreement and were continuing to try to outbid each other. *Matsushita*, 475 U.S. at 588 (internal quotations and citation omitted). First, for all their troubling emails, the evidence shows that Encana and Chesapeake did *not* agree to tank the Zaremba deal. True, one Encana executive said the companies "appeared" to have reached an agreement before Chesapeake's deal with the Zarembas fell apart. R. 379-18, Pg. ID 7130. But appearances can be deceiving. The evidence shows that after that executive sent his email, Encana and Chesapeake continued to compete vigorously for the Zaremba leases. Encana's initial offer for those leases was $2,000 per acre, but the amount contemplated in the ultimate letter of intent was $2,900 per acre—a *twenty-three million dollar increase* in the deal's total value. And that increase was brought on by competition from Chesapeake, as evidenced by a series of emails showing that the companies were "bidding each other up" even as they separately tried to work out their mutual-interest agreement. R. 362-8, Pg. ID 5338–39. Indeed, just days before the Zaremba-Chesapeake deal fell apart,

Chesapeake's CEO said of the Zaremba deal: "[Encana] won't share, let's win."  R. 362-51, Pg. ID 5657.  And this all happened *after* Encana circulated its draft mutual-interest agreement to Chesapeake and the Encana executive said the companies appeared to have agreed on an arrangement.  There is only one way to read this evidence:  Encana and Chesapeake certainly talked about a mutual-interest agreement as they were negotiating with the Zarembas, but they were simultaneously engaged in a bidding war and never reached a collusive truce.  This is "conduct [] consistent with permissible competition," *Matsushita*, 475 U.S. at 588, and therefore cannot sustain an inference of an anti-competitive agreement.

That just leaves the infamous Encana-Chesapeake phone call.  As the Zarembas point out, the emails indicating that the companies were "bidding each other up" were sent a few days *before* the Zaremba-Chesapeake deal fell apart.  But on the day Chesapeake purportedly tanked the deal with its poison pill, Encana and Chesapeake executives talked about their companies' potential agreement in a phone call.  Accordingly, the Zarembas suggest that the executives may have finally struck their agreement that very morning.  But the inference the Zarembas seek to draw is firmly rebutted by the record evidence.  The Encana executive's contemporaneous notes about that call do not say anything about the Zarembas—and in fact reflect that the companies still had *not* reached an agreement.[3]  *See* R. 379-9, Pg. ID 7102 (noting that Encana and Chesapeake's arrangement was "subject only to definitive agreement," that the draft agreement "needs work to get to where [Chesapeake] thinks we're headed," and that Chesapeake was "on the side of quality versus timing").  In addition, in a post-call email to colleagues, that same Encana executive said he "continue[d] to feel" that Chesapeake was "not really motivated to enter an [agreement]."

---

[3] The Zarembas argue that a juror could draw an adverse inference from the fact that, when asked about the call under oath, the executives involved invoked their Fifth Amendment right against self-incrimination.  But the Encana executive involved in the call later revoked his Fifth Amendment invocation and testified that the executives did not speak about the Zarembas and that they did not reach a deal with Chesapeake on that call.

R. 362-10, Pg. ID 5351. All this evidence says, in no uncertain terms, exactly the opposite of what the Zarembas would have a jury conclude. Although we view the evidence in the light most favorable to the Zarembas, there is a limit to the inferences we can draw in their favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment is appropriate where evidence is "so one-sided" that no "fair-minded jury could return a verdict for the plaintiff"). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). So it is here.

Finally, the Zarembas make no attempt to show how their poison-pill theory makes sense in light of the parties' later behavior. Two days after the Zarembas signed with Encana, Chesapeake notified the Zarembas that Chesapeake's offer *had not yet expired*. That same day, a Chesapeake manager wrote to Chesapeake's CEO about Encana's "unwillingness to end the competition," and expressed doubt that continuing to pursue a mutual-interest agreement with Encana was even worth it. R. 362-48, Pg. ID 5650. Chesapeake's CEO responded that the manager should "freeze [Encana] for another 10 days or so," because it was "probably still better for us for them to believe we'll do a deal with them." *Id.*, Pg. ID 5649. These messages show that not only had Encana and Chesapeake failed to reach an agreement before Chesapeake purportedly tanked the Zaremba deal, but that their negotiations had been going so poorly Chesapeake was considering bowing out. Again, in light of this evidence, there is simply no way a reasonable juror could believe the Zarembas' poison-pill theory. So, if they are to succeed, it must be on a different one.

*Theory Two: The Freeze Out.* The Zarembas' next theory is that Chesapeake and Encana agreed to simultaneously walk away from any binding deal with the Zarembas after Encana and

the Zarembas entered into the letter of intent. Since the evidence discussed above shows that the companies had not reached any collusive agreement *before* the Zarembas signed with Encana, the Zarembas' freeze-out theory can succeed only if they can show that the companies did so *afterward*. Here again, the evidence belies the Zarembas' position. Chesapeake emails show that it learned about Encana's decision to walk away from the Zaremba deal not from Encana—its alleged partner-in-crime—but from an anonymous participant in an online natural-gas discussion forum. And when an employee forwarded that post to Chesapeake's CEO, he reacted with surprise and said that Encana's decision made him "nervous." R. 383-4, Pg. ID 7558. He then emailed an Encana executive, asking whether Encana's sudden exit meant that it had "no more interest in joining forces down the road." R. 362-35, Pg. ID 5573. After ignoring him for a few days, the Encana executive responded, curtly, that Encana had "decided to discontinue further leasing," and would "reassess [its] position after the summer." *Id.* Yet again, this evidence does not "tend[] to exclude the possibility" that Encana and Chesapeake were acting independently. *Matsushita*, 475 U.S. at 588 (internal quotations and citation omitted). Encana kept Chesapeake in the dark about its decision to walk away from the Zaremba deal, and it was not interested in playing nice even when Chesapeake's CEO tried to mend the fence. These emails contradict the Zarembas' freeze-out theory, and the Zarembas have failed to point to any evidence to the contrary. So this theory must fail too. *See Scott*, 550 U.S. at 380.

*Theory Three: Ongoing Price Depression.* The Zarembas' final theory is that after the companies tanked the Zaremba deal, they succeeded in decreasing the going rate for mineral-rights leases across northern Michigan. The Zarembas thus argue that they not only lost the opportunity to do a deal with Encana or Chesapeake, but also the opportunity to do so at a fair price on the open market with some other player. In support, they point to evidence suggesting that the

companies reached an agreement several months after they stopped negotiating with the Zarembas. For instance, in one Encana executive's notes from a later phone call with Chesapeake, he wrote that the "principles" of Encana and Chesapeake's potential agreement were "non compete," "share data," and "save billions." R. 379-14, Pg. ID 7121. And in a later email, another Encana executive identified an area of land up for auction as "a [Chesapeake] area [where] we will not be bidding." R. 379-28, Pg. ID 7170.

This evidence "tends to exclude the possibility" that Encana and Chesapeake acted independently. *Matsushita*, 475 U.S. at 588 (internal quotations and citation omitted). But the Zarembas cannot win under this theory: It fails to connect the companies' alleged collusion to any harm that the Zarembas suffered. A reasonable juror could credit the Zarembas' evidence that the companies eventually formed a collusive agreement, but the Zarembas nevertheless fail to point to evidence suggesting that they even considered leasing their rights after their last communication with Chesapeake in July 2010. They claim they did so in their briefing, but appellate briefing is not summary-judgment evidence. As the Supreme Court has held, antitrust plaintiffs are required to show "that the conspiracy caused *them* an injury for which the antitrust laws provide relief," not just that the defendant was up to no good. *Atl. Richfield*, 495 U.S. at 344 (quoting *Matsushita*, 475 U.S. at 584 n.7). So, since the Zarembas have not pointed to any competent summary judgment evidence from which a reasonable juror could infer that they suffered an injury in the months after the companies walked away from their deal, their price-depression theory fails. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (holding that moving party may discharge its burden on summary judgment by pointing out the absence of evidence to support the non-moving party's case).

III.

After Encana sued the Zarembas for breach of contract, the Zarembas counterclaimed that Encana was liable for fraud and fraudulent inducement. Both Encana's breach-of-contract claim and the Zarembas' fraud claims went to trial. At the close of proofs, both sides made motions for judgment as a matter of law, which the district court denied.

We review the denial of a motion for judgment as a matter of law de novo. *Mich. First Credit Union v. CUMIS Ins. Soc., Inc.*, 641 F.3d 240, 245 (6th Cir. 2011). Where federal courts sit in diversity, as the district court did here, they apply the standard for judgment as a matter of law used by the courts of the state whose substantive law governs the action. *Id.* In Michigan, judgment as a matter of law may be granted only where "reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Id.* (quoting *Ridgway v. Ford Dealer Comput. Servs., Inc.*, 114 F.3d 94, 97 (6th Cir. 1997)). Just like at summary judgment, we view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id.*

A.

Encana argues that the district court erred by denying its motion for judgment as a matter of law on its breach-of-contract claim. Specifically, Encana takes issue with the court's treatment of the Zarembas' waiver defense. At trial, the Zarembas admitted that they had failed to comply with the letter of intent's terms by refusing to return the $1.8 million. Instead, they mounted a waiver defense, relying on Encana's agent's assurance that they could keep the entire $2 million after Encana decided to walk away from the deal. Encana argues that Michigan law required the Zarembas to provide consideration for Encana's waiver. The district court held that Michigan law

- 11 -

did not require the Zarembas to provide consideration and instructed the jury accordingly. The jury ultimately found that Encana had waived its right to recoup the earnest money.

The district court erred: Michigan law requires consideration for a waiver to be effective. The Michigan Model Civil Jury Instructions explicitly state that "[a] waiver of a substantial [contract] right requires consideration." *See* M Civ. JI 142.41. And the instructions cite *Babcock v. Public Bank*, in which the Michigan Supreme Court said just that: "waiver of a substantial right . . . is a matter of contract which requires a consideration." 114 N.W.2d 159, 164 (Mich. 1962). The Zarembas do not contest that the right to collect $1.8 million qualifies as a "substantial right." And since the Zarembas made no attempt to prove consideration at trial, Michigan law dictates that Encana's waiver was not effective. *Id.*; *cf. Lee v. Macomb Cty.*, 284 N.W. 892, 893 (Mich. 1939) ("Waiver being contractual in its nature can be no more effective as a bar than an express agreement or contract . . . .").

The Zarembas have not pointed to any intervening Michigan authority that questions *Babcock*'s validity. In fact, as Encana points out, Michigan courts continue to cite *Babcock* with some regularity. *See Brown v. Northwoods Animal Shelter*, No. 299361, 2011 WL 5072600, at *2 (Mich. Ct. App. Oct. 25, 2011) (per curiam) (citing *Babcock* for the proposition that "[a] release must be supported by sufficient consideration to be considered valid"); *Jack v. Hastings Mut. Ins. Co.*, No. 278109, 2008 WL 4958787, at *3 (Mich. Ct. App. Nov. 20, 2008) (per curiam) (same); *Davis v. Meade Grp.*, No. 262190, 2006 WL 142527, at *1 (Mich. Ct. App. Jan. 19, 2006) (per curiam) (same); *Karapetian v. Pontiac Osteopathic Hosp.*, No. 187077, 1996 WL 33358118, at *1 (Mich. Ct. App. Sept. 20, 1996) (per curiam) (same). Instead, the Zarembas point to *McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 344 (Mich. 1964), in which the Michigan Supreme Court held that proof of consideration is not required to enforce a contract *modification*. But

modification and waiver are different. Waiver occurs when one party unilaterally surrenders its right to object to a counterparty's failure to perform a contract obligation. In contrast, modification occurs when parties mutually agree to change the terms of an agreement. This is a waiver case. So *McCarty* is inapposite.

The Zarembas next argue that "the vast majority of courts"—*i.e.*, courts in states other than Michigan—require no consideration for waiver. And indeed, *Williston on Contracts* says as much. 13 *Williston on Contracts* § 39:25 (4th ed.). But the Michigan Supreme Court says what the law is in Michigan. And as a federal court sitting in diversity, "we are bound by what we believe Michigan courts would do." *J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1485 (6th Cir. 1991) (quoting *Diggs v. Pepsi-Cola Metro. Bottling Co.*, 861 F.2d 914, 927 (6th Cir. 1988)). The Zarembas cannot circumvent Michigan law by pointing out that Michigan has adopted a minority position.

With their consideration arguments exhausted, the Zarembas try one more avenue. Under Michigan law, an agreement made to discharge a contractual obligation "shall not be invalid because of the absence of consideration" if that agreement is "in writing and signed by the party against whom it is sought to enforce the change." Mich. Comp. Laws § 566.1. So even though *Babcock* requires consideration for waiver of substantial contract rights, Michigan law *also* suggests that a waiver lacking in consideration may be enforceable if it is set out in a signed writing. *Id.* The Zarembas thus argue that, regardless whether they failed to prove consideration, the jury could have found that Encana's waiver was enforceable because it was in fact set out in such a writing.[4]

---

[4] The Zarembas take a curious position in interpreting § 566.1. At one point, they rely on § 566.1 to argue that consideration is *never* required for a waiver. But this argument is contrary to the provision's plain text, which indicates that an agreement discharging an obligation is not invalid absent consideration *if* there is a signed writing. Elsewhere, the Zarembas reverse course, suggesting that § 566.1 does not apply to waivers *at all*. We will assume to the

The Zarembas point to two such writings. First, an email chain in which Encana employees discussed the potential consequences of backing out of the Zaremba deal. Those emails noted that "[w]alking on Zaremba" could cause Encana to "lose $2MM in earnest money." R. 375-3, Pg. ID 6530. Second, a copy of a 1099-MISC tax form that Encana sent to the Zarembas after it submitted that form to the IRS, in which Encana noted that it had paid the Zarembas $2 million. But neither an *internal* Encana email nor a tax form constitutes an "*agreement . . .* in writing" between Encana and the Zarembas. Mich. Comp. Laws § 566.1 (emphasis added). Moreover, the tax form was not signed. *Id.* (an agreement discharging a contract obligation "shall not be valid or binding unless it shall be in writing *and signed* by the party against whom it is sought to enforce") (emphasis added). So neither of these documents can serve as a consideration substitute under MCL § 566.1.

In sum, the district court was incorrect that (1) waiver of a substantial contractual right does not require consideration under Michigan law and (2) the Zarembas' proffered writings were sufficient to satisfy § 566.1. Thus, since the Zarembas did not argue that Encana's purported waiver was in fact supported by consideration, no reasonable juror could lawfully find that they had succeeded on their waiver defense. The district court should have granted Encana's motion for judgment as a matter of law.[5]

### B.

The Zarembas appeal the district court's denial of their motion for judgment as a matter of law on their fraud counterclaims.[6] The Zarembas claim that Encana made false representations

---

Zarembas' benefit, however, that § 566.1 does apply and that absent consideration, the Zarembas could enforce Encana's waiver by pointing to a signed writing.

[5] Given that Encana was entitled to judgment as a matter of law at the close of proofs, we need not reach its claim that the district court improperly instructed the jury on the Zarembas' waiver defense.

[6] Before the case was submitted to the jury, Walter Zaremba and the Zaremba Group voluntarily dismissed their counterclaims in recognition of the fact that damages accruing from those claims accrued to Zaremba Family Farms. For continuity, this section will continue to refer to "the Zarembas."

that led them to sign the letter of intent and forgo the opportunity to strike a deal with Chesapeake. They argue that the evidence on this claim was so one-sided that they were entitled to judgment as a matter of law.

To prevail on their fraud claims, the Zarembas had to show that (1) Encana made a material representation, (2) that was false, (3) that Encana knew the representation was false when it was made (or made it recklessly), (4) that Encana made the representation with the intent that the Zarembas rely on it, (5) that the Zarembas did in fact rely on it, and (6) that the Zarembas were injured as a result of that reliance. *U.S. Fidelity & Guaranty Co. v. Black*, 313 N.W.2d 77, 82 (Mich. 1981) (quoting *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976)). The Zarembas base their fraud theory on a single email from an Encana representative informing the Zarembas that she had "confirmed with [Encana's] VP" that Encana included the "non-binding language" in the letter of intent because it had to "observe Encana's Corporate protocol for Board approval of the deal." R. 598-1, Pg. ID 12789. The representative then assured the Zarembas that she "ha[d] authority and budget to enter into the deal in good faith." *Id.* The Zarembas argue that the jury was required to view these statements as knowing or reckless misrepresentations because Encana's management had not yet issued a final approval authorizing a binding lease of the Zarembas' rights.

The Zarembas' argument hinges on the idea that the only way to understand Encana representative's reference to the "deal" was as a reference to the final acquisition. There was ample evidence, however, that the "deal" referred to was the signing of the non-binding letter of intent and the transfer of the $2 million in earnest money, which Encana's representatives did in fact have the "authority and budget" to carry out. At trial, the head of Encana's land-negotiations team testified that management had authorized her to offer the Zarembas up to $2 million without

seeking further approval. She also testified that the Encana vice president who signed the letter of intent had the authority to agree to the letter on Encana's behalf. Moreover, the Encana representative who sent the disputed email testified that she intended "deal" to mean "letter of intent." And *the Zarembas' own representative* testified unequivocally that he "knew that the deal [Encana's representative] was referring to was [the letter of intent]." R. 606-3, Pg. ID 13031. Indeed, the letter of intent itself made clear that (1) the final purchase agreement would be a document separate from the letter of intent that would not be finalized for at least a few more weeks, and (2) a final purchase might *never* be completed. This was more than enough evidence for the jury to conclude that the Encana representative did not make a misrepresentation of fact, much less an intentional or reckless one. And so the district court correctly held that the Zarembas were not entitled to judgment as a matter of law.

IV.

The final dispute on appeal is over the Zarembas' motion for a new trial. At trial, Encana called an attorney with knowledge about oil-and-gas industry contracting practices as an expert witness. During his testimony, the district court repeatedly sustained the Zarembas' objections to the expert's attempts to testify as to improper legal conclusions. Afterward, the district court issued a curative instruction that the jury should "disregard any opinion" given by the expert about "what the law does or does not require." R. 625, Pg. ID 16323. The court then reminded the jurors that he, the trial judge, was "the sole judge of the law," and would be "giving [the jury] instructions about the law to be applied" during deliberations. *Id.* The Zarembas later made a motion for a new trial, arguing that the expert's testimony had tainted the jury. The district court denied that motion.

We review the denial of a motion for a new trial for abuse of discretion. *Clarksville-Montgomery Cty. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002–03 (6th Cir. 1991) ("The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." (quoting in parenthetical *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (per curiam))). Where the district court admitted allegedly improper evidence but later issued a curative instruction, we will reverse only if (1) there is an "overwhelming probability" that the jury did not or could not follow the instruction and (2) a strong likelihood that the effect of the evidence was "devastating" to the moving party. *See Holmes v. City of Massillon*, 78 F.3d 1041, 1047 (6th Cir. 1996) (quoting in parenthetical *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)). The burden of showing this likelihood of prejudice is on the party seeking the new trial. *See Clarksville*, 925 F.2d at 1002.

The Zarembas cannot clear this very high bar for several reasons. First, they have not established an "overwhelming probability" that the jury could not follow the district court's curative instruction. They seem to rely instead on the generalized notion that one cannot "unring the bell" once improper trial testimony has been heard by the jury. But that argument cannot itself win the day. If it could, there would be no need for the "overwhelming probability" standard— we would simply reverse every time jurors were exposed to improper testimony. That is not the law. *See Clarksville*, 925 F.2d at 1002 (explaining that when "prejudice is cured by instructions of the court, the motion for a new trial should be denied").

Second, the Zarembas fail to show a strong likelihood that the expert's testimony was "devastating" to their case. The testimony the Zarembas challenge related to the appropriate measure of *damages* for the alleged fraud, *not* to the Zarembas' attempt to prove fraud *liability*. Since the verdict form showed that the jury rejected the Zarembas' claim on liability, it is difficult

to see how the challenged testimony could have had a "devastating" impact here.  Therefore, the district court did not abuse its discretion in denying the Zarembas' motion for a new trial.

V.

For these reasons, we **AFFIRM** the district court's decisions to (1) grant Encana's motion for summary judgment on the Zarembas' antitrust claims, (2) deny the Zarembas' motion for judgment as a matter of law on their fraud claims, and (3) deny the Zarembas' motion for a new trial.  We **REVERSE** the district court's denial of Encana's motion for judgment as a matter of law on its breach of contract claim, **VACATE** the corresponding judgment, and **REMAND** with instructions to enter judgment for Encana.