IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 15, 2025 Session

## SUSAN OAKES, ET AL. v. MARK A. FOX, M.D., ET AL.

**Appeal from the Circuit Court for Cumberland County**
**No. CC1-2019-CV-6494      Michael S. Pemberton, Judge[1]**

_____

**No. E2024-00453-COA-R3-CV**
_____

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

This is a healthcare liability action against a surgeon and the hospital where the surgeon practiced. The trial court granted summary judgment to the defendants. We affirm.

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. Michael Swiney, C.J., and Kristi M. Davis, J., joined.

Ira M. Long, Jr., Chattanooga, Tennessee, and William Cameron, Cookeville, Tennessee, for the appellants, Susan Oakes and Randy Oakes.

Rachel Park Hurt, Devin P. Lyon, and Raymond Grant Lewallen, Knoxville, Tennessee, for the appellees, Mark A. Fox, M.D. and Covenant Medical Group, Inc.

**OPINION**

**I. BACKGROUND**

In 2018, plaintiff Susan Oakes was diagnosed with early-stage breast cancer after a mammogram and a biopsy revealed a small invasive ductal carcinoma. Ms. Oakes, age 58 at the time, thereafter, met with Dr. Mark A. Fox, who maintains that he offered Ms. Oakes the options of: (a) lumpectomy, radiation, and sentinel lymph node biopsy ("SLNB"); or (b) mastectomy and axillary lymph node dissection ("ALND"). Ms. Oakes answered an interrogatory as follows:

**RESPONSE**: My first appointment with Dr. Fox was on February 12, 2018. His assistant, Dawn, was present at this appointment and others. Dr. Fox gave

---

[1] Sitting by designation.

me three options. The first was to have a biopsy of my lymph nodes before surgery and then he would perform a lumpectomy followed by radiation and chemotherapy.

The second was removal of my right breast and taking out one or two lymph nodes for a pathologist to examine during the surgery to see whether they contained cancer and whether more lymph nodes needed to be removed.

The third option was the same as option two, plus removal of my left breast. He said it was easier to match the appearance of one breast to the other if both were removed and reconstructed. I told him that I was not interested in reconstruction. He said that because of my large breasts, I would have a problem with my balance if he removed only my right breast. He said that by removing both breasts, I would also avoid the future risk of breast cancer and would not need any more mammograms in the future . . . .

Ms. Oakes further answered that she asked Dr. Fox what he would recommend for his wife if she were in Ms. Oakes's situation. According to Ms. Oakes, Dr. Fox responded that he would chose mastectomy of both breasts. Dr. Fox recalled as follows:

A: She also – one other question she did ask, she looked me square in the eye and said "what would you want your wife to have done?" That was a question she asked.

Q: How did you answer that?

A: When someone asks me that, that changes it. That lets me speak personally, okay? That changes my answer and my coat I'm wearing from a doctor and surgeon and someone trying to take care of a patient to a personal situation. So I don't volunteer that unless I'm asked, but once I'm asked, that's free information to give. And I told her, "I would want my wife to have a mastectomy, a modified radical on the side with the cancer, and axillary dissection and a simple mastectomy on the other side." And she said, "Well, I trust you."

Defendants note that Dr. Fox offered Ms. Oakes an opportunity to get a second opinion and think about her options. She voluntarily denied seeking out further advice.

Dr. Fox's charting and treatment records regarding Ms. Oakes reveal the following:

We discussed her options ….

1. Breast conserving therapy in terms of lumpectomy, sentinel lymph node

excision, radiation to remaining breast and then possibly oral or intravenous chemotherapy based on a pathology node status versus a modified radical mastectomy and axillary lymphadenectomy, then chemotherapy based on her nodes and size of tumor…. She understands that there is risk of surgery in her case particularly of bleeding, infection, lymphedema, chest skin flap necrosis, anesthetic intolerances such as CVA, DVTs, PE and MIs. She has asked questions and states she understands and desires to proceed with the mastectomies. She will pick up her orders and go and pre register. We will leave the need for any preoperative evaluation, lab or EKG wise to the anesthesia protocols. She knows to be n.p.o. after midnight. She takes no anticoagulants that are prescribed.

<Electronically signed by Mark Alan MD FACS Fox>

_____
Dictated: Fox, Mark Alan MD, FACS 02/13/18 1346

Cumberland Medical Center History & Physical.

Patient Plan RIGHT MODIFIED RADICAL MASTECTOMY AND LEFT SIMPLE MASTECTOMY-Risks were explained to the patient to include: seroma, injury to the long thoracic nerve, injury to the thoracodorsal nerve, need for a skin graft, risk of arterial injury, stroke, bleeding tendency, breathing problems, need for further surgery, incomplete resolution of symptoms, heart trouble and heart attack, pulmonary embolus, risk of bleeding, risk of infection, medication allergy or intolerance, risks of blood clots, risk of blood clots going to the heart, lungs or brain, bad reaction to local anesthesia, bad reaction to general anesthesia, potential need and risk of transfusion, risk of vein injury.

According to Ms. Oakes, Dr. Fox told her that she would require chemotherapy if she had a lumpectomy, but not if she had a mastectomy. She contends that avoiding chemotherapy was why she chose the mastectomy option. Dr. Fox notes that her reason for selecting mastectomy was because of radiation, not chemotherapy. Ms. Oakes acknowledged in her deposition that her decision was motivated somewhat by her refusal to undergo radiation treatment, which, Dr. Fox informed her was necessary follow-up with the lumpectomy procedure:

Q: During your discussions with Dr. Fox, did you tell him that you did not want to have radiation treatment?

A: I might have told him I didn't want to have no treatments. . . . I don't know what I told him, what all I told him.

- 3 -

Q: All right. If Dr. Fox is going to testify that you said you didn't want radiation treatment, would you dispute that?

A: I'm not going to dispute that because I probably wouldn't have wanted it. . . .

In this action, however, she contends that despite telling Dr. Fox that she did not want radiation treatment, "if it meant I could keep my breasts and I still wasn't going to die from cancer, I would have done it. I didn't want to take my breasts off, but I wanted to live so I done it."

Dr. Steven Efird, Plaintiffs' expert, acknowledged in a deposition that, based upon his review of the record in the matter, he found Dr. Fox's charting to be truthful that Ms. Oakes refused radiation. Dr. Fox related in his deposition that Ms. Oakes stated "[s]he had some relatives, I believe an aunt who had breast cancer . . ." and "told me . . . that relative or someone, some experience she had had, had a bad experience with radiation treatment and she did not want—she made that very clear even before the exam, before we started talking about options, that she did not want radiation treatment. That was obviously very important to her."

On the day of the surgery, Ms. Oakes signed a consent to procedure form which reveals she expressly consented to the ALND procedure without any limitation on the number of lymph nodes to be removed. In this action, she argues that her consent "does not say all lymph nodes, and [she] did not agree to him removing all lymph nodes." In her deposition, Ms. Oakes related:

A: I thought I was having a modified radical and he said he would take one or two lymph nodes, there would be a pathologist right there that he would hand those off to, they would check. If they didn't have any cancer, then he would stop right there. With the modified radical he would take all the breast and one or two lymph nodes, then he would do a simple mastectomy on the left, which means he would just take the breast, he would be taking no lymph nodes.

Q: So a modified radical on the right, a simple mastectomy on the left, and then your understanding was one or two lymph nodes?

A: That's what he said. He said that he would have a pathologist there and they would check those lymph nodes then.

However, Dr. Fox's nurse, Dawn O'Neal, testified in a deposition that she knew of no time during her tenure with Dr. Fox when a pathologist was available to give an opinion during

surgery.

Six months after the procedure performed by Dr. Fox, Ms. Oakes sought revision surgery with Raeshelle Sweeting, M.D., at Vanderbilt because of residual breast tissue. Dr. Sweeting testified in a deposition that the surgery was not medically necessary, and she offered Ms. Oakes a treatment option of simply monitoring her chest without performing any surgery at all. According to Dr. Sweeting, even after the second surgery, Ms. Oakes, who was obese, would have excess tissue; she explained that breast surgery is not intended to remove fat or extra tissue along the side of the body. Dr. Sweeting acknowledged that Ms. Oakes told her that "she decided against lumpectomy to avoid chemotherapy."

Ms. Oakes asserts the surgery by Dr. Fox resulted in the unnecessary removal of her breasts and caused incurable lymphedema and pain, swelling, weakness, and decreased range of motion in her arm and shoulder. She asserts that but for Dr. Fox's surgery, she would have retained both her breasts, the need for a revision surgery would not have occurred, and she would not have developed lymphedema. She further contends that she was not provided with the necessary information to intelligently consent, and that Dr. Fox misinformed her about the relative risks and benefits of a breast-conserving lumpectomy (which she was fully qualified for) versus a breast-amputating mastectomy. According to Ms. Oakes, Dr. Fox neglected to tell her that the probability of a cure was the same with either procedure.

Regarding lymphedema, Dr. Fox related in a deposition as follows:

Q: . . . So in Susan Oakes' case, had she received from you a lumpectomy and sentinel node biopsy, my question is, would her risk of developing lymphedema have been less?

A: If she had chosen that operation and had undergone that operation, her risk of lymphedema should have been statistically less just from the operation, discounting what might be additive from the chemotherapy and radiation that she would have needed with that choice.

* * *

A: . . . So I can't tell you a number of how much less Ms. Oakes' chances of developing lymphedema would have been with sentinel lymph node and lumpectomy versus modified radical mastectomy. It is less. The report is less. Given all her situations, I can't give you a number. If you're wanting a percentage less, I can't tell you that.

Q: Did you discuss that with her?

A: That the incidence of lymphedema is less with sentinel lymph node and axillary or and lumpectomy?

Q: Yes.

A: Yes.

\* \* \*

A: I told her that a modified radical mastectomy and axillary dissection has a higher incidence of lymphedema in her than lumpectomy and sentinel lymph node. Yes, I did.

Dr. Sweeting also acknowledged that lymphedema could occur in the absence of negligence.

The lawsuit in this matter was filed on April 26, 2019. Ms. Oakes and her husband Randy Oakes ("Plaintiffs") allege that Dr. Fox and Covenant Medical Group, Inc. ("Defendants") were negligent in the care and treatment of Ms. Oakes relating to a double mastectomy and ALND procedure she elected to undergo in February 2018, and that Dr. Fox's care and treatment of Ms. Oakes, amounting to reckless surgical overtreatment, deviated and fell below the acceptable standards of professional practice and care.

After several attempts to set this case for trial, as well as numerous requests by Plaintiffs to reset it, a final scheduling order was entered on March 9, 2023, nearly four years after the case was filed. Pursuant to that order, a pre-trial conference was scheduled for January 25, 2024; trial was scheduled for February 5-15, 2024. Defendants moved for summary judgment asserting: (1) Dr. Fox properly obtained informed consent from Ms. Oakes and properly educated her on her treatment options and the risks; (2) The revision surgery was elective, not medically necessary, (3) Lymphedema is a known complication of any surgery affecting the lymph nodes, and Plaintiffs have no proof other than mere speculation that any alleged negligence by Dr. Fox was the but-for cause of Ms. Oakes's lymphedema; and (4) To the extent summary judgment is awarded to Dr. Fox, it must also be granted to Covenant Medical Group, Inc.

During this lawsuit, it appears that Plaintiffs missed every single deadline: neglecting to identify their sole expert until after the required deadline; late filing motions in limine; attempting to designate deposition testimony after the required deadline (including the deposition of their sole expert); not filing a response to Defendants' Motion for Summary Judgment five or more days before the pre-trial conference; not filing any response of any kind to Defendants' Motions in Limine; and not filing jury instructions of any kind. Defendants argue that they were prevented from timely preparing for trial by the actions of Plaintiffs. They especially note the difficulty in timely preparing a reply to

Plaintiffs' attempted response to Defendants' Motion for Summary Judgment (filed less than 24 hours before the scheduled hearing).

At the final pre-trial conference, the trial court refused to allow its scheduling order to be "toothless and meaningless;" it ruled that "[t]here has to be some meaning to scheduling orders, and litigants are entitled to have their cases heard and not unduly delayed." The court found that Plaintiffs' "response to the defendants' motion for summary judgment was not timely filed and will not be considered." The trial court observed: "Implicit in that ruling is the granting of the defendants' motion to strike, at least as it pertains to the motion for summary judgment."

Upon reviewing Plaintiffs' numerous failures to meet deadlines, the trial court then "analyze[d] whether what are now the uncontested material facts warrant a grant of summary judgment." Defendants' Statement of Undisputed, Material Facts ("SUMF") was deemed admitted for purposes of consideration of the Motion for Summary Judgment. The trial court ruled as follows:

> The Court has reviewed each of the separate statements of undisputed material facts submitted by the defendant and the exhibits referenced therein as well as the arguments made today in respect to those facts.
>
> And since this Court has found that they are undisputed, the Court adopts them as its factual finding in support of a grant of summary judgment to the defendant on all causes of action alleged in the complaint.
>
> These causes of action include, as has been argued . . . best cancer treatment options, informed consent, negligence in the performance of the surgery, causation as to the occurrence of the lymphedema, and causation as to the second surgery. So in essence, this Court grants the defendants' summary judgment. This case is dismissed.

In the SUMF, Ms. Oakes "acknowledged that it was her own decision to proceed with a double mastectomy, which demonstrates that it was her intention to have both of her breasts removed. . . ." She signed a written consent for her surgery that described the procedure she received. The SUMF also stated that "Dr. Fox properly and sufficiently explained all possible surgical options, the likely outcomes and risks of each—including lymphedema— and properly obtained Ms. Oakes's informed consent for her mastectomies."

In the face of further pleading by Plaintiffs' attorney at the conclusion of the hearing, the trial court allowed further consideration only of "the issue . . . on the negligent surgery . . . as pled in the complaint . . . and considering only the proof that's in the record after having stricken their response . . . ." The court requested that Defendants demonstrate in a brief how they negated the essential element of causation as to the negligent performance

of the surgery theory. Upon reviewing briefs from both parties, the court found that Defendants had affirmatively negated the essential element of every theory advanced by Plaintiffs. As no genuine issue of material fact was found, Defendants' motion for summary judgment was granted and the case was dismissed in its entirety. This timely appeal followed.

## II. ISSUES

We restate the relevant issues raised by Plaintiffs as follows:

a. Whether the trial court erred in granting summary judgment on Plaintiffs' medical negligence claims in finding that Defendants' motion negated an element of the claim.

b. Whether the trial court erred in granting summary judgment on Plaintiffs' informed consent claim in finding that Defendants' motion negated an element of the claim.

## III. STANDARD OF REVIEW

We review the trial court's grant of summary judgment *de novo*, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Abshure v. Methodist Healthcare-Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010)). As part of the review, we "take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993) (citations omitted), holding modified by *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008), holding modified by *Rye*, 477 S.W.3d 235. We similarly accept the evidence presented by the nonmoving party as true and resolve any doubts about the existence of a genuine issue of material fact in its favor. *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 887 (Tenn. 2019) (citing *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 84 (Tenn. 2008)).

A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. When the party moving for summary judgment does not bear the burden of proof at trial, "it may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. When a motion for summary judgment is made and supported as provided in Rule 56, the nonmoving party may not rest on the allegations or denials in its pleadings. *Id.* at 265.

Instead, the nonmoving party must respond with specific facts showing that there is a genuine issue of material fact to be resolved at trial. *Id.*

## IV. DISCUSSION

### A.

We observed in *Kenyon v. Handal*, 122 S.W.3d 743 (Tenn. Ct. App. 2003):

> Good trial judges set and enforce deadlines and also have the right to assume that the deadlines they set, as well as those imposed by the rules, will be honored. Because trial courts enjoy substantial discretion to control the disposition of cases on their dockets, we customarily defer to their decisions regarding continuances, enlargements of time, or other relief from deadlines. Accordingly, we will let the trial court's decision on these matters stand in the absence of clear prejudicial error under the circumstances of the case.

*Id.* at 751 (internal citations omitted). A trial court "has wide latitude to impose sanctions for a party's failure to comply with the scheduling orders. *Clarksville-Montgomery Cnty. School Sys. v. United States Gypsum Co.*, 925 F.2d 993, 998 (6th Cir. 1991). "It is within the trial judge's discretion to decide what orders, if any, to issue as a consequence of a party's failure to obey a scheduling order." *Id.* (internal citations omitted).

Upon our review, we find that the trial court did not abuse its discretion in enforcing the deadlines set forth in the Scheduling Order. The court appropriately and within its discretion determined that Plaintiffs' response to Defendants' Motion for Summary Judgment was untimely filed (and also without correct citation to the record), and as such, Defendants' SUMF was properly deemed admitted.

Plaintiffs have appealed the trial court's granting of summary judgment; they have not appealed the trial court's granting of Defendants' Motion to Strike Plaintiffs' untimely response to Defendants' Motion for Summary Judgment. Defendants assert that our review should be limited to their Motion for Summary Judgment only, which was unopposed in the trial court because Plaintiffs failed to properly file a response. Defendants contend that the new factual assertions Plaintiffs have raised on appeal are improperly before this court and are irrelevant to the resolution of this appeal. Defendants request that this court consider only the facts set forth in Defendants' SUMF. Upon our review, we accede to the request.

### B.

In the unopposed Motion for Summary Judgment, Defendants argue that they negated an essential element of each of Plaintiffs' claims—primarily causation and

damages. Plaintiffs contend that their negligence claim should be permitted to proceed to trial because the surgery that Dr. Fox performed on Ms. Oakes allegedly increased the risk of lymphedema. Ms. Oakes argues that the mere performance of the dissection (versus biopsy) violated the standard of care and was the legal cause of the lymphedema from which she suffers. Plaintiffs rely upon the case of *Compton v. Pass*, 773 N.W.2d 664 (Mich. 2009), for the proposition that an increased risk in lymphedema from an ALND procedure is sufficient to allow a factfinder to determine that there was a breach of the standard of care.

As noted by the trial court, regarding Plaintiffs' negligence claim, Plaintiffs are required to prove by expert medical testimony:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115. Causation is the third element required to be proven to successfully bring a *prima facie* healthcare liability action. Tenn. Code Ann. § 29-26-115(a)(3). To overcome Defendants' motion, Plaintiffs were required to proffer competent evidence, at the summary judgment stage, that "[a]s a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred." *Id.* A mere possibility of causation is not enough to satisfy this burden. *White v. Methodist Hosp. S.*, 844 S.W.2d 642, 649 (Tenn. Ct. App. 1992). Instead, "the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is *more likely than not* that the conduct of the defendant was a cause in fact of the result." *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985) (emphasis added); *see also Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn.1993). Plaintiffs had the burden before the trial court of proving that the "injury or harm would not have occurred '**but for**' the negligent conduct." *Kilpatrick*, 868 S.W.2d at 598 (emphasis added) (citing *Caldwell v. Ford Motor Co.*, 619 S.W.2d 534, 543 (Tenn. Ct. App. 1981)).

The trial court observed as follows:

> 11. Regarding the last element — causation and damages — Defendants affirmatively negated that any alleged breach in the standard of care caused an injury that would not have otherwise occurred. Specifically,

- 10 -

a. Plaintiffs' alleged damages of unnecessary loss of both of her breasts, the unnecessary removal of healthy tissue from her right armpit, permanent disfigurement associated with unnecessary double mastectomies and permanent physical impairment to her breasts fail as a matter of law because Ms. Oakes chose the procedures that Dr. Fox performed. Her choice was consistent with other individuals who have chosen the same surgery, and that same surgery has been performed by Plaintiffs' sole expert, Dr. Efird,

b. Plaintiffs failed to offer admissible evidence that Dr. Fox's alleged negligence was the but for cause of Ms. Oakes' second, elective surgery. The undisputed proof in the form of the Review of Pathology Reports and Slides report—prepared by Defendants' pathology expert—Ellen Krasik, M.D.— (which detailed her microscopic review of the pathology specimens and the process by which she reached her conclusions)—demonstrated that the tissue that remained after Dr. Fox's surgery was expected and a reasonable outcome for all surgeons performing mastectomies. This proof was undisputed, as Plaintiffs' only expert, Dr. Efird, did not know the amount of breast tissue that remained after surgery, could not guess, and declined to offer any opinion regarding the pathology in this case. The reason for the second, elective surgery was cosmetic.

c. Plaintiffs also failed to demonstrate any admissible evidence that Dr. Fox's surgery was the but for cause of Ms. Oakes' lymphedema. No evidence was proffered that any alleged negligence during the surgery caused her lymphedema. Instead, Plaintiffs' assertion was that the surgery performed— in the absence of negligence—caused lymphedema. Since the undisputed proof was that Ms. Oakes chose to have a double mastectomy and ALND, to the extent that the surgery was the but for cause of the lymphedema, that causal relationship fails to demonstrate liability on the part of Defendants. Additionally, the undisputed proof—in the form of the testimony of Plaintiffs' expert—was that lymphedema cannot be predicted, lymphedema can and does occur in the absence of negligence, lymphedema can and does occur in patients who receive any breast procedure, and lymphedema can be worse in patients who receive lumpectomy and sentinel node biopsy. Based upon these undisputed facts, the Court is of the opinion that the Jury would be required to speculate that Ms. Oakes would not have been diagnosed with lymphedema if she had elected to undergo lumpectomy and sentinel node biopsy, and the jury is not permitted to speculate.

Upon reviewing the procedural history of *Compton*, we find the case distinguishable. The admissible facts in the present case are that Ms. Oakes chose the procedure she received after appropriate informed consent was obtained. As noted by the

- 11 -

trial court, her choice was consistent with other individuals who have chosen the same surgery, and that same surgery has been performed by Dr. Efird. Plaintiffs have not demonstrated that Dr. Fox's actions were responsible for any increased risk of lymphedema or the cause in fact and proximate cause of the claimed lymphedema. In the present case, there is no admissible evidence before this court demonstrating that Ms. Oakes's lymphedema was more likely than not caused by any action of Dr. Fox. There is no admissible evidence that an increased risk in lymphedema from an ALND procedure is sufficient to allow a factfinder to determine that there was a breach of the standard of care.

As observed by the trial court, Dr. Efird's expert testimony—as set forth in Defendants' SUMF—demonstrates that lymphedema is a chronic condition that can develop in patients undergoing any type of surgery where as few as one lymph node is removed. It can occur in the absence of negligence. Certain potential factual indicators were present in Ms. Oakes's case, which suggest a heightened risk of lymphedema—even in the absence of negligence. Thus, one would be required to improperly speculate to conclude that Ms. Oakes would not have been diagnosed with lymphedema if she had elected to undergo lumpectomy and SNB. Therefore, the undisputed facts in this case are inconsistent with those facts present in the Michigan decision.

Regarding the revision surgery, the trial court determined that "Plaintiffs failed to offer admissible evidence that Dr. Fox's alleged negligence was the but for cause of Ms. Oakes second, elective surgery." Dr. Efird acknowledged that follow-up revision surgeries are normal, and the fact that Ms. Oakes had one does not mean that Dr. Fox violated the standard of care. As observed by the trial court, the pathology evidence from Defendants' expert "demonstrated that the tissue that remained after Dr. Fox's surgery was expected and a reasonable outcome for all surgeons performing mastectomies." The court noted that this proof was undisputed.

Defendants have put forth sufficient evidence to affirmatively negate the essential elements of Plaintiffs' claim of medical negligence arising from Dr. Fox's performance of the double mastectomy and ALND. Further, the evidence of record does not establish that Dr. Fox's initial surgery violated the standard of care in a manner that was the but-for cause of the revision surgery. "A judgment cannot be based upon conjecture or speculation and the probable effect of an injury must be shown to be reasonably certain, and not a mere likelihood or possibility." *White*, 844 S.W.2d at 649. Upon our review, we must conclude that Plaintiffs did not produce sufficient evidence to establish that any negligence of Defendants was the cause in fact of Ms. Oakes's asserted injuries.

## C.

Undisputed material fact No. 5 of the SUMF stated:

Dr. Fox properly and sufficiently explained all possible surgical options, the likely outcomes and risks of each—including lymphedema—and properly obtained Ms. Oakes's informed consent for her mastectomies.

Defendants note that in Dr. Efird's deposition, he agreed that Dr. Fox had properly and sufficiently explained all possible surgical options, the likely outcomes and risks of each—including lymphedema—and properly obtained Ms. Oakes' informed consent for her mastectomies: "I believe every treatment was offered." The medical records demonstrate that Dr. Fox specifically informed Ms. Oakes regarding the risk of lymphedema from her chosen surgery, which meets Dr. Efird's expectations as established by his testimony.

Dr. Efird admitted that "the way in which Dr. Fox [. . .] charted the treatment options did not cause any injury to Ms. Oakes" and that the charting "did not cause any secondary provider to take a different or adverse path in treatment." Despite Dr. Efird suggesting that perhaps Dr. Fox was "leaning" toward ALND as a treatment option rather than SNB, the only expressed criticism that he offered was that Dr. Fox could have (as opposed to should have) charted with an eye toward providing more of an explanation for why Ms. Oakes was choosing the procedure she desired. Dr. Efird conceded that because he does not know what was and was not said, any opinion rendered regarding a purported violation of the informed consent standard would be speculative. He clarified that informed consent does not need to be in writing, and the patient does not need to be informed of all information about a particular procedure or all data known about a particular procedure.

Plaintiffs rely upon the following deposition testimony from Dr. Efird:

So just from reviewing the notes, I don't think that enough time was spent letting her understand that bigger is not better. It seems to be from her conversations and from the notes, the sparsity of the notes that –that it was pretty well put to her that you really need the whole apple. You really need the whole breast. And that's going to be the best chance for survival, and that's just not documented in the literature . . . .

The elements of an informed consent cause of action provide:

In a health care liability action, the plaintiff shall prove by evidence as required by § 29-26-115(b) that the defendant did not supply appropriate information to the patient in obtaining informed consent (to the procedure out of which plaintiff's claim allegedly arose) in accordance with the recognized standard of acceptable professional practice in the profession and the specialty, if any, that the defendant practices in the community in which defendant practices and in similar communities.

Tenn. Code Ann. § 29-26-118. We ruled in *Burchfield v. Renfree*, No. E2012-01582-COA-

R3-CV, 2013 WL 5676268 (Tenn. Ct. App. Oct. 18, 2013) (quoting *Church v. Perales*, 39 S.W.3d 149, 159-60 (Tenn. Ct. App. 2000)) as follows:

> [A] lack of informed consent violation occurs when the patient is aware that a procedure is going to be performed but is unaware of the potential risks associated with the procedure. The tort does not relate to the manner in which the procedure was performed, but rather to the manner in which the physician obtained the patient's consent to perform the procedure. . . . [P]atients seeking damages for lack of informed consent must prove that the physician's conduct fell below the applicable standard of care and that reasonably prudent persons in the patient's position would not have consented to the procedure if they had been suitably informed of the risks, benefits, and alternatives.

*Id.* at \*32. To obtain informed consent, "the health care provider must typically inform the patient of the nature of the patient's ailment, the nature of and the reasons for the proposed treatment or procedure, the risks or dangers involved, and the prospects for success." *Shadrick v. Coker*, 963 S.W.2d 726, 732 (Tenn. 1998). The standard for an informed consent claim requires Plaintiffs to prove—through expert testimony—that a reasonable person in Ms. Oakes' shoes would not have chosen to proceed with a double mastectomy with ALND had that person been adequately informed of the risks of the treatment. *Kidd v. Dickerson*, No. M2018-01133-COA-R3-CV, 2020 WL 5912808, at \*18 (Tenn. Ct. App. Oct. 5, 2020) (citing *Ashe v. Radiation Oncology Assocs.*, 9 S.W. 3d 119, 120 (Tenn. 1999)).

Contrary to Plaintiffs' assertions, Dr. Efird's testimony confirms that a reasonable person could choose the same procedure as Ms. Oakes. Dr. Efird testified that he had performed this exact double mastectomy and ALND procedure on patients previously. If no reasonable person would choose to have this procedure, Dr. Efird would not perform it and would have never performed it. His testimony confirms that a reasonable person could choose to have a double mastectomy with ALND in this circumstance. As argued by Defendants, this fact is fatal to Plaintiffs' informed consent claim.

On the issue of informed consent, the trial court concluded as follows:

> 9. The Court having found that (1) Dr. Fox properly and sufficiently explained all possible surgical options for Ms. Oakes' breast cancer, the likely outcomes and risks of each—including lymphedema—and (2) after these discussions, Ms. Oakes elected to proceed with a double mastectomy and axillary lymph node dissection ("ALND"), and (3) Ms. Oakes elected not to have less invasive procedures—lumpectomy and sentinel node biopsy—despite being given those options, and (4) Plaintiffs' expert, Dr. Efird, testified concerning the issue that other women, similarly situated,

- 14 -

have chosen the procedure that Mrs. Oakes chose. Based upon the aforementions, the Court finds that Plaintiffs' claim of lack of informed consent fails as a matter of law as Defendants have affirmatively negated the essential elements of a lack of informed consent claim.

The facts properly admitted to the record support the trial court's determination that Defendants negated Plaintiffs' informed consent claim. We find no error.

## V. CONCLUSION

We affirm the trial court's judgment and remand to the court for collection of costs below. Costs of the appeal are assessed against the appellants, Susan Oakes and Randy Oakes.

_____
JOHN W. MCCLARTY, JUDGE